**U. S. ex rel. Donald M. COOK**

v.

**Gerald PARKINSON, etc.**

**No. CIV. 74–4023.**

United States District Court, D. South Dakota.

April 21, 1975.

Terry L. Pechota, Mission, S. D., Art Bunce, Escondido, Cal., for petitioner.

Tom D. Tobin, Winner, S. D., Lawrence E. Long, Martin, S. D., William Janklow, Atty. Gen., of S. D., Pierre, S. D., for respondent.

## MEMORANDUM OPINION

BOGUE, District Judge.

Petitioner Donald M. Cook has brought this action under 28 U.S.C. § 2241 et seq., the Federal Habeas Corpus Act, in an effort to secure his release from what he asserts is unlawful detention. The petitioner was convicted of the crime of third degree burglary which occurred in the city of Martin, County of Bennett, South Dakota. He was sentenced on June 4, 1971, in the Circuit Court of South Dakota, Sixth Judicial Circuit, and was incarcerated in the South Dakota Penitentiary on June 9, 1971. The petitioner asserts that his detention is unlawful upon the grounds that the state of South Dakota lacks jurisdiction to prosecute or imprison Indians for crimes committed by them within "Indian country" as defined by 18 U. S.C. § 1151(a).

Petitioner Cook is a three-eighths blood Indian and an enrolled member of the Concow and Redwood tribe of California Indians. His enrollment number is 6640 and his name appears on the Revised Roll of California Indians pursuant to the Act of May 24, 1950, 64 Stat. 189. It is not required

that petitioner be a member of the Oglala Sioux Tribe, the tribe for whose benefit the Pine Ridge Reservation in South Dakota was created, in order to have standing to challenge state jurisdiction over crimes claimed to have been committed on that reservation. It is sufficient to establish this element of federal jurisdiction that petitioner has proven membership in any Indian tribe recognized by the United States. Cook v. South Dakota, 215 N.W.2d 832 (1974), United States v. Jewett, 438 F. 2d 495 (8th Cir. 1971), United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886).

In this case the South Dakota courts have asserted jurisdiction over an Indian for acts committed within Bennett County, South Dakota. Although Bennett County was within the boundaries of the Pine Ridge Indian Reservation as that reservation was defined by 25 Stat. 888, 1889, and therefore under the jurisdiction and control of the Oglala Sioux Tribe and the federal government from 1889 to 1910, the state of South Dakota has without challenge exerted jurisdiction and control over Bennett County for the past sixty-five years since the Act of May 27, 1910, was passed by Congress. In its written opinion in this case the South Dakota Supreme Court reaffirmed its earlier rulings in State of South Dakota ex rel. Hollow Horn Bear v. Jameson, 77 S.D. 527, 95 N.W.2d 181 (1959), and State of South Dakota ex rel. Swift v. Erickson, 82 S.D. 60, 141 N.W.2d 1 (1966), that the Act of May 27, 1910, "was motivated by a congressional purpose to reduce the area of Pine Ridge" and that the State of South Dakota has jurisdiction over Bennett County.

█ █ Since the petitioner is an Indian and since his crime was found to have been committed in Bennett County, the State of South Dakota possesses no jurisdiction if Bennett County is "Indian country" under 18 U.S.C. § 1151(a). If the tract of land is within a continuing "reservation", jurisdiction is in the tribe and the Federal Government "notwith-

standing the issuance of any patent, and, including rights-of-way running through the reservation." 18 U.S.C. § 1151(a). On the other hand, if the land in question is not within a continuing reservation, jurisdiction is in the State, except for those land parcels which are "Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." 18 U.S.C. § 1151(c). Even within "Indian Country" a State may have jurisdiction over some persons or types of conduct, but this jurisdiction is limited. See, McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). Although 18 U.S.C. § 1151 applies on its face only to criminal jurisdiction, the United States Supreme Court has recognized that it generally applies as well to questions of civil jurisdiction. McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); Kennerly v. District Court of Montana, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971); Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).

█ Thus, the single question is presented whether the Act of May 27, 1910, 36 Stat. 440, was intended by Congress to diminish the Pine Ridge Reservation as originally defined in the Act of March 2, 1889, 25 Stat. 888, by removing Bennett County therefrom. This Court holds, for the reasons that follow, that the 1910 Act diminished the boundaries of the Pine Ridge Reservation, and that consequently the South Dakota state courts have jurisdiction over conduct on non-Indian lands within the 1889 reservation borders.

## PRELIMINARY STATEMENT

In 1851 the Treaty of Fort Laramie was negotiated between commissioners especially appointed and authorized by the President of the United States, and

the chiefs of the Sioux, Cheyenne, Arapahoe, Crow, Assinaboine, Gros-Ventre, Mandan and Arrickara Nations. The resulting agreement was signed on September 17, 1851 and proclaimed by President Millard Fillmore at 11 Stat. 749. The Treaty of Fort Laramie assigned to the Sioux lands which are now southwestern South Dakota and northwestern Nebraska, and included what is now Bennett County, South Dakota. The rather tenuous reservation described in the Treaty of Fort Laramie was modified and enlarged in 1868 when the United States and the Great Sioux Nation agreed upon the establishment of the Great Sioux Indian Reservation. This treaty was signed by General W. T. Sherman on behalf of the United States on April 29, 1868, ratified by Congress on February 16, 1869, at 15 Stat. 635, and proclaimed by President Andrew Johnson on February 24, 1869. The reservation formed by the 1868 Treaty, encompassed all the present state of South Dakota west of the eastern bank of the Missouri River, including Bennett County.

The parties to this suit agree that the Great Sioux Reservation was diminished from its 1868 boundaries by an Act of Congress on March 2, 1889, chap. 405, 25 Stat. 888. This 1889 Act reduced the Sioux lands to about half their former extent and restored the ceded portion to the public domain. In that Act the Pine Ridge Reservation was established and contained about 2,765,000 acres in what are now the counties of Bennett, Washabaugh, and Shannon. The statutory description of the Pine Ridge Reservation was as follows:

Beginning at the intersection of the one hundred and third meridian of longitude with the northern boundary of the State of Nebraska; thence north along said meridian to the South Fork of Cheyenne River, and down said stream to the mouth of Battle Creek; thence due east to White River; thence down White River to the mouth of Black Pipe Creek on White River; thence due south to said north line of the State of Nebraska; thence west on said north line to the place of beginning.

Although the preamble of the 1889 Act stated that the reservation was to be "permanent", Section 12 of the Act provided the means by which the United States could buy and the members of the Oglala Sioux Tribe could "sell" such "portions" of the "reservation" as could be agreed upon from time to time subject to the ratification of Congress. The portion of the reservation "so sold or released" was to "be held by the United States for the sole purpose of securing homes to actual settlers." Act of March 2, 1889, *supra,* Sec. 12.

Pursuant to Section 12, the United States initiated three separate negotiations for "portions of the reservation" with the members of the Oglala Sioux Tribe. Only one of these negotiations resulted in an Act of Congress, the Act of May 27, 1910, 36 Stat. 440, encompassing what is now Bennett County, South Dakota. Shortly after the Act, the United States released the unallotted land in the area thus acquired to actual settlers. This tract of land now consists primarily of small farms and ranches and has a population of approximately four thousand residents.

It is now the duty of this Court to examine the Act of May 27, 1910, 36 Stat. 440, along with the legislative history and the circumstances which led to enactment of this legislation, and to determine whether or not Congress, in passing this act, intended to diminish the reservation by extinguishing the Indian country character of Bennett County, or merely open Bennett County to homesteading without changing the outer confines of the Pine Ridge Reservation thereby. Each treaty or act must be analyzed separately to determine congressional intent. United States v. Ash Sheep Company, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920); Kills Plenty, et al. v. United States, 133 F.2d 292, 295 (8th Cir. 1943). The issue has been ex-

tensively and excellently briefed by both parties. In general the issue presented here has been discussed at length in two law review articles. *See,* Comment, New Town, et al.: The Future of an Illusion, 18 S.D.Law Rev. 85 (1973); Smith, New Town, et al: A Reply, 18 S.D.Law Rev. 327 (1973).

■ The United States Supreme Court recently reaffirmed and clarified the guidelines to be applied in determining questions relating to Indian reservations. In DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (3-4-75), the Court stated:

This Court does not lightly conclude that an Indian reservation has been terminated. "[W]hen Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress." United States v. Celestine, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195. The congressional intent must be clear, to overcome "the general rule that '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon ' its protection and good faith.' " McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, at 174, 93 S.Ct. 1257, at 1263, 36 L.Ed.2d 129, quoting Carpenter v. Shaw, 280 U.S. 363, at 367, 50 S.Ct. 121, at 122, 74 L.Ed. 478. Accordingly, the Court requires that the "congressional determination to terminate . . . be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." Mattz v. Arnett, 412 U.S. [481], at 505, 93 S.Ct. [2245], at 2258 [37 L.Ed.2d 92]. See also Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346, and United States v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192. In particular, we have stressed that reservation status may survive the mere opening of a reservation to settlement, even when the moneys paid for the land by the settlers

are placed in trust by the Government for the Indians' benefit. Mattz v. Arnett, *supra* and Seymour v. Superintendent, *supra.*

Certainly in construing treaties and statutes passed for the benefit of Indians and Indian tribes, courts must construe them liberally and whenever possible resolve any doubt in favor of the same. Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); Carpenter v. Shaw, 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478 (1930); Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912); Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918).

ACT OF MAY 27, 1910, 36 STAT. 440

The Act is entitled:

An Act to authorize the sale and disposition of the surplus and unallotted lands in Bennett County, in the Pine Ridge Indian Reservation, in the State of South Dakota, and making appropriation to carry the same into effect.

## OPERATIVE LANGUAGE OF THE ACT

■ The operative language of the 1910 Act reads as follows:

. . . the Secretary of the Interior be, and he is hereby, authorized and directed, as hereinafter provided, to *sell* and *dispose* of all that portion of the Pine Ridge Indian Reservation, in the State of South Dakota, lying and being in Bennett County and described as follows . . . Act of May 27, 1910 § 1 (36 Stat. 440). [Emphasis added.]

Immediately following the metes and bounds description, a "provided" clause was included to allow the Bennett County allottees the privilege of reselecting an allotment in the area of the reservation unaffected by the legislation. The provision reads as follows:

Provided, That any Indian to whom allotments have been made on the *tract to be ceded* may, in case they elect to do so before said lands are of-

fered for sale, relinquish same and select allotments in lieu thereof *on the diminished reservation.* Act of May 27, 1910, § 1 (36 Stat. 440, 441). [Emphasis added.]

The words used in the 1910 Act, when given their plain and ordinary meaning, show a clear congressional intent on the face of the act to diminish the Pine Ridge Reservation by authorizing the Secretary of the Interior to sell and dispose of the described tract of land to be ceded. Bennett County, "the tract to be ceded," was to be sold and disposed of and the remaining portion of the reservation or the "diminished reservation" was to remain reserved by the government for the use and occupancy of the Pine Ridge Indians. In Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), the Court similarly construed the statutory term "diminished reservation" to mean that the north half of the Colville Reservation was vacated and restored to the public domain but that the south half or "diminished Colville Indian Reservation" was still reserved by the government for the Colville Indians' use and occupancy. By use of the metes and bounds description, Congress clearly and specifically delineated "the tract to be ceded" from the "diminished reservation". *See also,* Rosebud Sioux Tribe v. Kneip, 375 F. Supp. 1065 (D.S.D.1974); Cook v. State, S.D., 215 N.W.2d 832 (1974).

The term "ceded", when given its plain and ordinary meaning, evidences a clear congressional intent to terminate the "Indian country" character of Bennett County. In 1913, the Eighth Circuit Court of Appeals addressed a portion of its opinion to the significance of the term in United States v. Myers, 206 F. 387 (8th Cir. 1913):

It would be impossible to select words operating more completely to *extinguish every vestige of Indian title,* and releasing the government more absolutely from every obligation, moral as well as legal. *Id.* at 392 (Emphasis added.)

Felix Cohen has succinctly stated the import of the term:

Ordinarily, Indian title is extinguished by cession under treaty or act of Congress, and the *land ceases to be Indian country* when the cession becomes effective. Federal Indian Law, 16 (1958). [Emphasis added.]

Black's Law Dictionary defines the term as:

CEDE—To yield up; to assign; to grant. Generally used to designate the transfer of territory from one government to another. Black's Law Dictionary, Third Ed. (1933).

Ballentines Law Dictionary defines the term as:

CEDE—The precise meaning of the word depends somewhat on the subject matter with which it is connected. In some instances, it is used in the sense of 'grant', but ordinarily it means to yield, to surrender, to give up. *Thus a person grants, conveys, or deeds land, whereas a nation transfers territory by ceding it.* Ballentines Law Dictionary, 3rd Ed. (1969). [Emphasis added.]

Bouvier's Law Dictionary defines the term as:

CEDE—To assign; to transfer. Applied to the act by which one state of nation transfers territory to another. Bouvier's Law Dictionary, Baldwins Century Ed. (1934).

The Tenth Circuit Court of Appeals in Ellis v. Page, 351 F.2d 250 (10th Cir. 1950), observed that the use of this and similar language was unequivocal:

In treaty parlance they are as appropriate to *disestablish the reservations* as the Congressional words "vacate and restore" employed in the 1892 Act to disestablish a portion of the Colville Reservation. *Id.* at 252. (Emphasis added.)

The operative language of the 1910 Act, when given its plain ordinarily understood meaning, evidences the clear congressional intent to diminish the Pine Ridge Reservation by selling and dispos-

ing of Bennett County, the tract of land to be ceded. The legislative history and the circumstances surrounding the 1910 Act, as well as the other provisions of the act, support this construction.

## HISTORY OF THE ACT—SENATE BILL 7380

The 1910 Act originated in 1909. When the Pine Ridge Reservation was created by Congressional Act in 1889, Section 12 of that act read as follows:

Section 12. That at any time after lands have been allotted to all the Indians of any tribe as herein provided, or sooner, if in the opinion of the President it shall be for the best interest of said tribe, it shall be lawful for the Secretary of the Interior to negotiate with such Indian tribe for the purchase and release by said tribe, in conformity with the treaty or statute under which said reservation is held of such portions of its reservation not allotted as such tribe shall, from time to time, consent to sell, on such terms and conditions as shall be considered just and equitable between the United States and said tribe of Indians, which purchase shall not be complete until ratified by Congress: . . . Act of March 2, 1889, § 12 (25 Stat. 888).

The first recorded attempt to implement Section 12 and thereby reduce the size of the Pine Ridge Reservation was initiated by Senator Gamble of South Dakota on December 9, 1908 when he introduced Senate Bill 7380. Section one of that bill read as follows:

. . . the Secretary of the Interior be, and he hereby is authorized and directed, as hereinafter provided, to sell and dispose of all that portion of the Pine Ridge Reservation in the State of South Dakota lying and being within the following described boundaries, to-wit: [metes and bounds description of the Pine Ridge Reservation lying north of the Tenth Standard Parallel.]

Although the United States Supreme Court in 1903 had decided Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903), and as far as Congress and the Department of the Interior were concerned, this decision stood for the rule of law that Congress had the plenary power to diminish the size of an Indian reservation and to effectuate a cession without the ratification of three-fourths of the adult male Indian population of the tribe consenting, Inspector James McLaughlin was detailed to conduct the negotiations with the Pine Ridge Indians. The Departmental Instructions issued to Inspector McLaughlin could not be located by the parties to this case and are therefore not before this Court, but it is clear from the other documents presented that members of Congress coveted Indian lands. Pressures for land for settlers were great, not only from South Dakotans, but from people from the east who wished to move west. In response to this pressure Senate Bill 7380 was drafted and introduced in 1908. On December 21, 1908, in a letter to the Secretary of the Department of Interior, Mr. John R. Brennan, Superintendent of the Pine Ridge Agency in South Dakota, expressed his displeasure that Senate Bill 7380 proposed to open the northern portion of the reservation. Superintendent Brennan stated:

It would have been far more consistent had a bill been introduced to open a strip fifteen to twenty miles wide along the south side of the reservation; the people there having received their allotments two, three and four years ago. They are mostly mixed bloods and self supporting. Doc. 2A, National Archives Records of the Bureau of Indian Affairs, Letters Received: Special Case 83653-08-308.1, Letter No. 86977, Dec. 21, 1908.

Superintendent Brennan further stated that Senate Bill 7380 was "premature and not in the best interests of the Pine Ridge Indian" because the allotment schedule within the "tract named in the

bill" would not be complete for some time and even when complete, would leave as surplus only what is known as "bad lands". Doc. 2A, *supra*, at 1–2. The objections pointed out by Superintendent Brennan proved responsible for the eventual failure of the legislation.

Nevertheless, on February 4, 1909, on behalf of the Committee on Indian Affairs, Senator Gamble reintroduced the bill and submitted a report. This report contains clear probative evidence that confirms the operative language on the face of Senate Bill 7380 that the legislation, if enacted, would dispose of that portion of the Pine Ridge Reservation described and thereby diminish the reservation. Senator Gamble stated:

> . . . the Secretary of the Interior, in his discretion, may permit Indians who have an allotment within the area proposed to be opened to relinquish such allotments and to receive in lieu thereof allotments anywhere *within the reservation proposed to be diminished.* S.Rep.No. 910, 60th Cong. 2d Sess., p. 2 (1909). (Emphasis added.)

In addition, Senator Gamble explained:

> Sections 16 and 36 of the lands in each township are not to be *disposed of,* but are reserved for the use of the common schools of the State, and these land are to be paid for by the government *in conformity with the provisions of the Act admitting the State of South Dakota into the Union.* S.Rep. No. 910, *supra,* at 2. (Emphasis added.)

The provision of the Act admitting the State of South Dakota into the Union provides:

> Nor shall any lands embraced in Indian, military, or other reservations of any character be subject to the grants or to the indemnity provisions of this act *until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain.* Act of February 22,

1889, 25 Stat. 676. (Emphasis added.)

Thus, it is clear from the operational language and from the legislative history of Senate Bill 7380, that this proposed legislation had as its purpose to sell and dispose of all unallotted lands in the described portion of the Pine Ridge Reservation, to diminish the reservation, to extinguish the Indian country character of the tract of land described therein, and to return that tract of land to the public domain.

Shortly after Senator Gamble's report was delivered it became evident that opposition to Senate Bill 7380 was growing. On February 13, 1909, Senator Martin stated:

> One or more bills are pending, calling for the opening of the Pine Ridge Indian Reservation to settlers. While I am anxious that *every foot* of Indian Reservation in South Dakota *become common territory* as soon as this can be done in justice to the Indians and in safety to the white people, I have serious doubt as to whether the Pine Ridge Reservation has reached that point. Doc. 7, National Archives Records of the Bureau of Indian Affairs, Letters Received: Special Case 83653–08–308.1, Letter No. 12056, February 13, 1909. [Emphasis added.]

Evidently the proponents of "common territory" prevailed, however, because Inspector McLaughlin was ordered to South Dakota where he conducted negotiations with tribal representatives of the Pine Ridge Indians on March 16, 1909, and on April 5, 1909.

NEGOTIATIONS—SENATE BILL 7380

The theme which permeates the entire transcript of these 1909 Pine Ridge negotiations is that the business at hand was not in any material respect different from the various land cessions that members of the tribe recalled from the past. The subject was repeatedly referred to as negotiations for a tract of

land or sale of land or cession of a portion of the reservation. Inspector McLaughlin stated:

> The great increase in population in this country demands a great deal more *public lands* upon which the settlers may make homes, and there is a continual pressure being brought to bear upon congressmen to open the surplus lands of Indian reservations in their respective states, and while the President of the United States, the Secretary of the Interior and the Commissioner of Indian Affairs are very desirous that the Indians be fairly treated, and will endeavor to have them receive fair compensation for their land, they, at the same time, will not stand in the way of the development of the country. Doc. 11A, April 5, 1909, Pine Ridge Council Hearing by James McLaughlin, U.S. Indian Inspector, pages 16–17. (Emphasis added.)

Inspector McLaughlin made it clear that the 1908 bill was a proposal and not a unilateral action by Congress and stated:

> The fact, which I wish you to not overlook, is that Congress may enact legislation for the opening of Indian reservations without consulting the Indian occupants. This was determined by a decision of the United States Supreme Court in what is known as the *Lone Wolf* case. . . . While this is the law, my friends, it is not the wish of the Commissioner of Indian Affairs, the Secretary of the Interior or president that legislation should be enacted which would arbitrarily open Indian reservations without *first presenting the matter to the Indians* and endeavor to obtain their *consent* thereto, and that is why I am now here presenting to you this *proposed* opening of that part of your reservation lying north of the 10th standard parallel. Doc. 11A, *supra*, at 4–5. (Emphasis added.)

Inspector McLaughlin equated opening with public domain:

> The *opening* of that part of your reservation as contemplated by the bill referred to, does not mean that the entire tract is to become *public domain, but only the surplus lands opened to settlement for homesteaders,* that is, all lands that have not been allotted to Indians would be open to entry as homesteads by citizens of the United States under the provisions of the bill. Doc. 11A, *Supra,* at 2. (Emphasis added.)

Various tribal members spoke their views on the proposal and their statements reveal a clear understanding that the bill would effect a sale of cession of the described tract of land which would diminish the reservation. The tribal members present understood the proposed agreement to be no different than other cession agreements in the past which had been a source of disappointment and hard feelings. Charles Turning Hawk stated:

> In the past when the Government has asked us for large tracts of land that we had, we *turned them over to the Government,* but at the present time, we have not a very large piece of land, and also the President has given us this land to be ours. The President gave us this land and we expect to have it all for our children, grandchildren and relatives, all Indians, and we consider this tract of land to be our own. After the President let us have this land as our own, we do not want any white people to have their own way; we want to be the ones to have the say about this. Doc. 11, March. 16, 1909, Pine Ridge Council Hearing by James McLaughlin, U.S. Indian Inspector, pages 1–2. (Emphasis added.)

George Sword stated:

> Referring back to treaties, no matter if we did not want to *give up any portion of land,* we were forced to, but we are getting along towards civiliza-

tion now and we do not want to open up this tract of land. Doc. 11, *supra*, at 4. (Emphasis added.)

Joseph Eagle Hawk stated:

We know, at this day, our ancestors kept *giving tract after tract of land away* until now we have very little. Doc. 11, *supra*, at 4. (Emphasis added.)

Plenty Bear stated:

We have also followed the wishes of the President in the past and *given away large tracts of land,* but we have not been treated fairly and we are getting to observe all these things and we are afraid we will be treated in the same way again. Friend, we are afraid of you and we want to keep this land. We do not want you to *take this land away from us* because this land is ours. If this land is to be *given up,* we desire the consent of three-fourths of the people. Doc. 11, *supra*, at 8. (Emphasis added.)

Charles Turning Hawk added:

The former treaties, which we have made, have not been abided by in the way they should have been according to the provisions of same, and we wish to have done as said at the time the treaties were made. By having a new President we thought that all the things which we mentioned would be straightened out, but instead of that *you come to take a portion of the little tract of land, which we have at the present time.* Ever since the white race came over from Europe, we have been giving them tract after tract of land, until at the present time, we have a very small amount left. Doc. 11A, *supra*, at 6–7. (Emphasis added.)

George Sword added:

When all our allotments are made, if there is any land left, that will be time enough for you to come and talk about it. We stated this at the time that Governor Foster, General Cook and Major Warner made a treaty with us. At that time we told them to put this down on the paper so that it would be stated that we did not want to *sell any more land,* and they said 'how', but they fooled us, and afterwards I saw a copy of the treaty, but I did not see the clause with reference to us *not selling any more land.* Among ourselves, we made it a rule at that time, never to *sell any more land,* so we do not want to break the rule and *part with a portion of the land.* Doc. 11A, *supra*, at 7–8. (Emphasis added.)

Plenty Bear explained:

We owned a large tract of land once, but the government officials came and negotiated with us in regard to the same and we *ceded it away* until we have this very small tract at the present time. I have also stated this in council before. The government has not abided by the treaties for our other tracts of land it has bought, so we do not want to *sell a foot of this land.* I also want you to tell this to the President and to the Congress. Doc. 11A, *supra*, at 9–10. (Emphasis added.)

John Little Commander stated:

Today we are standing on one treaty now. If we are standing on one treaty, why should we make another treaty. We do not want this new treaty and we *do not want to sell the land.* Doc. 11A, *supra*, at 14. (Emphasis added.)

It is clear that the tribal representatives present fully understood the effect that Senate Bill 7380 would have had on their reservation. Inspector Mc-Laughlin submitted his report on negotiations to Washington, D.C. on April 19, 1909, wherein he accurately portrayed the solid opposition of the Oglala Sioux Tribe to Senate Bill 7380.

It is clear from the operational language on the face of Senate Bill 7380, and from the legislative history and surrounding circumstances, that the purpose of this proposal if enacted, was to sell and dispose of all unallotted land in

the described portion of the Pine Ridge Reservation, extinguish the Indian country character of the described land, diminish the reservation, and return the described tract of land to the public domain. This conclusion is important foundation for determination of the issue presented in the instant case because petitioner concedes of Senate Bill 7380 that:

> This bill was *substantially identical* to Senate Bill 2341. The only difference between the two bills is that the latter proposed to open what is now Bennett County to settlement, while the former instead proposed to open all that portion of the original Pine Ridge Reservation of 1889 north of 'the tenth standard parallel north'. Otherwise the bills are *practically identical.* Petitioners Brief at 34–35. (Emphasis added.)

The petitioner further states:

> An appropriate place to begin discussion of the legislative history of the Act of May 27, 1910 is with the report of the Senate Committee on Indian Affairs on Senate Bill 7380, dated February 4, 1919. The bill was *identical in almost all respects* to Senate Bill 2341, the bill which eventually became the Act of May 27, 1910. *The only difference between the two bills was that the former proposed to open a [s]trip of land along the northern edge of the reservation in what is now Washabaugh and Shannon Counties, while the latter proposed to open what is now Bennett County.* Petitioner's Brief at 53. (Emphasis added.)

## HISTORY OF THE ACT—SENATE BILL 2341

Immediately after word was received in Washington, D.C., that the primary reason for the solidarity in opposition to Senate Bill 7380 centered around the portion of the reservation thereby affected, Senator Gamble redrafted the legislation as Senate Bill 2341 by changing only the parcel of land described therein so that as revised it would encompass the southeastern corner of the Pine Ridge Reservation corresponding to what is now Bennett County, South Dakota. In presenting his opinion on Senate Bill 2341, Agent Bates set forth the following rationale:

> . . . there would be no objection from the Indians as the lands north of the foregoing described area are allotted or held in reserve for full blood Indians, while the lands within this area are allotted or will be allotted to mix bloods, who have been anxious for several years to have this portion of the reservation opened . . . . The people within this area are of a progressive class and while the unallotted lands at the time of opening would be very small, the allottees themselves would be benefited and it would bring the country forward. Doc. 22, National Archives Records of the Bureau of Indian Affairs, Letters Received: Special Case 83653–08–308.1 Letter No. 53673, July 2, 1909.

Senator Gamble, in referring Senate Bill 2341 to R. A. Ballinger, Secretary of the Interior, stated:

> I respectfully recommend that the bill be referred to Inspector James McLaughlin with instructions to take the matter up with the Indian Tribe looking to an *agreement with them for a cession of the lands in question,* so that the measure may be in position to receive early consideration at the convening of the regular session in December next. Doc. 14, National Archives Records of the Bureau of Indian Affairs, Letters Received: Special Case 83653–08–308.1. (Emphasis added.)

## NEGOTIATIONS—SENATE BILL 2341

 Inspector McLaughlin was sent to the Pine Ridge Indian Reservation in South Dakota to negotiate for the tract of land described in Senate Bill 2341 and he arrived at the Pine Ridge Agency on September 1, 1909. The transcripts of these negotiations clearly es-

tablish that Senate Bill 2341 was not a unilateral action by Congress but a negotiated agreement, to which a tribal majority consented. The negotiations leading to the agreement on Senate Bill 2341 demonstrate that the Indians were keenly aware that they were taking a not insignificant step in selling the reservation lands. The statements contained in the transcripts disclose that both tribal leaders and tribal members understood that the business at hand was not any different from the various earlier land cessions to which the Oglala Sioux Tribe had been a party. All parties understood that Inspector McLaughlin had returned to negotiate for the sale and cession of the described tract of land. Various tribal members stated:

> Charles Turning Hawk: We have been *giving the Government land* until we have only a very small strip left and for that reason I think we should go back and trace up our old treaties to the present time. Doc. 25, National Archives Records of the Bureau of Indian Affairs, Transcript of Oglala Tribal Council meetings with Inspector James McLaughlin, September 1, 2, and 15, 1909; Special Case 83653–08–308.1, at 8. (Emphasis added.)

> George Fire Thunder: I think we are the guardians of the white people instead of them being the guardians of us, because we have been *giving them land* ever since they crossed the ocean up to the present day. *Id.* at 10. (Emphasis added.)

> Black Wolf: We have been *presenting you with land* and the land is just like a carpet of money and instead of us being rich today, we are the poorest of the lot. *Id.* at 11. (Emphasis added.)

> Little Wound: I wish to say that all the land that we have had, we have been *giving it to the white people*, till at the present time we have only a very small piece of land left, and I think that the President cannot have any pity on us Indians. A great number of us have not been allotted yet, and if this was opened, what are we going to do? For this reason we do not wish to *part with this land*, and I wish you to go back to the President and remember all these things and report them to him. *Id.* at 16. (Emphasis added.)

> Plenty Bear: My friends, I thought that you were not going to come here again and ask for any more land, but my friend, you came and ask for more land . . . Once upon a time all this land was ours, but *we have given you large areas* until you are rich. Take for instance the Black Hills. *Id.* at 18–19. (Emphasis added.)

> Plenty Bear: You owe us much by the treaties that you make with us and give us only a little part of it. We have only a small piece left . . . The people know that this is their piece of land, and they want it, that is why they talk this way. When you ask for such a great big piece you surprise us. *Id.* at 50.

> Long Commander: This Oglala Council is not satisfied with anything because the land named is too large. This Council stated that they are going to wait awhile. *Id.* at 51.

The statements of those present at the 1909 negotiations reveal that both tribal leaders and tribal members accurately understood that Senate Bill 2341 would change the boundaries and thereby decrease the size of the Pine Ridge Reservation. The diminished area of land over which the Oglala Tribe could exercise control and the proposed boundaries which would result if Senate Bill 2341 became law were specifically referred to, directly and indirectly, many times by all parties present. Inspector McLaughlin stated:

> The land as embraced by the bill introduced by Senator Gamble at the last Session of Congress, is in the *southeastern part* of your reservation and is represented on the map you see here by the *red lines.* Doc. 25, *supra,* at 1. (Emphasis added.)

In responding to the expressed desire of several tribal members present to change slightly the metes and bounds description of the tract of land to be sold under Senate Bill 2341, Inspector McLaughlin stated:

> I am glad to know that you begin to see the wisdom of meeting this question commendably, as evidenced by a number of you having asked for certain changes in the *proposed boundaries. Id.* at 39. (Emphasis added.)

The members of the Tribe responded in a variety of ways, all of which are susceptible of only one interpretation:

> Silas Red Dog: When making that drawing of the *proposed boundary lines* there, my friends seemed to be restless; they seemed to be crying to me . . . I wish to say a few words in regard to the outline on the map. *Id.* at 12–13. (Emphasis added.)

> George Fire Thunder: In drawing that map, and since they do not abide by the treaties they have made, I do not consent to this line you have drawn upon the board there. *Id.* at 10.

> Plenty Bear: That map scares all these people . . . my friend, we have a very small tract of land but you are scaring us by wanting almost half of it. *Id.* at 18.

When the discussion narrowed to the alteration of the red-lined "proposed boundaries" their remarks became even more specific:

> Fast Horse: My friend, I wish to say that we want to cut off a piece from the western end of that embraced in the bill, also a strip on the north side. We would like to have it done in that way . . . We *do not wish to part* with the northern tier of townships and the two western tiers of townships embraced in the Gamble Bill. *Id.* at 30. (Emphasis added.)

> He Dog: I am in favor of the line suggested by Fast Horse, or the one suggested by our Agent which would be the *line dividing* townships thirty-seven and thirty-eight extending from the eastern boundary of our reservation to the line between ranges forty-two and forty-three, which is the western boundary of the Gamble Bill. *Id.* at 32. (Emphasis added.)

> White Face: My friend, looking over the red pencil outline of the Gamble Bill yesterday made me feel bad and I was scared. I was afraid the people that came from the eastern parts of our reservation would feel bad and when I found out this morning that you could probably fix it so that a partion of this could be cut off, it made feel better. *Id.* at 35.

> Fast Thunder: I have been thinking about this before, but I have not said anything. The width of that tract being twenty-seven and a half miles as proposed by the Gamble Bill, I do not favor, but I am *thinking of a certain portion which I think would be all right for the people to give up.* I am in favor of the line suggested by He Dog. *Id.* at 36. (Emphasis added.)

> Bushy Top Pine: We cannot say everything here that we intend to say at the council, but we will try and look into the two *boundary lines* which were suggested here this morning. *Id.* at 38. (Emphasis added.)

The resolutions attached to the transcript similarly reflect the substance of the boundary terminology:

> The fixing of the *boundaries* . . . that this portion of the Pine Ridge Reservation, the *boundaries* of which portion we are willing to be determined by the Department of the Interior and in whose judgment we repose full confidence. . . . Doc. 25A, National Archives Records of the Bureau of Indian Affairs, Minutes of Meeting between Indian allottees of the Pine Ridge Indian Reservation and Inspector James McLaughlin, Sept. 7, 1909, Special Document Number 87934, Special Case 83653–08–308.1, at 1–3. (Emphasis added.)

Other references in the transcripts, while not directed specifically to the same issue, reveal the understanding that Senate Bill 2341, if agreed to, would change the 1909 boundaries of the Pine Ridge Reservation. One such example is the recognition of this fact by Silas Red Dog when he was referring, in part, to the privilege granted in Senate Bill 2341 to tribal members holding allotments in the area to be ceded to exchange their allotment for one within the diminished reservation:

> You see the map there, *the outline of the reservation,* and you think it is of good size, but if you will travel over it you will see it is very small. Referring to the bill where the sailors and soldiers come in and get land, and that the Indians could go back on the *other side;* there is no place where the Indians could take allotments on the *other side.* Doc. 25, *supra,* at 14–15. (Emphasis added.)

On September 23, 1909, Inspector McLaughlin submitted his written report to the Secretary of the Interior on the results of the negotiations concerning Senate Bill 2341. In addition to the council meetings of September 1, 2 and 15, 1909, that were transcribed and referred to *supra,* Inspector McLaughlin notes that other meetings were held but that unfortunately no stenographer was available to record what was said. Inspector McLaughlin stated in his report that during these later unrecorded council meetings the members of the Oglala Sioux Tribe concurred in and consented to the proposed sale of reservation lands described in Senate Bill 2341 with certain stated changes. Inspector McLaughlin referred to the agreement reached as a "cession" and set out the boundaries of the reservation as diminished by the agreement:

> The Pine Ridge Indians thereby *consent* to the opening of that portion of their reservation embraced in the County of Bennett, as said county is at present defined, and the *boundaries of the tract thus consented to* by the Pine Ridge Indians are as follows: . . . The above described *boundaries* embrace twenty-eight full townships and twelve fractional townships, of the southeastern corner of the Pine Ridge Indian Reservation, . . . which is about seventy thousand acres more than one fourth of the Pine Ridge Indian Reservation . . . the western *boundary* of the tract proposed to be opened by the provisions of the said Senate Bill, is the range line between ranges forty-two and forty-three, while the *western boundary* of Bennett County, South Dakota, *which the Indians desire,* is the range line between ranges forty and forty-one. The provisions of the Bill as to the *northern boundary* of the tract to be opened is *concurred* in by the Indians, the line between townships thirty-nine and forty—as provided in the Bill—being the northern boundary of Bennett County, *therefore the only difference, as to the boundaries, between the provisions of the Bill and the concurrence of the Indians* . . . I am quite confident that the Indians would concur in dropping the northern tier of townships from the opening and have the *cession* extend far enough west. . . . Doc. 26, National Archives Records of the Bureau of Indian Affairs, Report of Inspector James McLaughlin to the Secretary of the Interior, September 23, 1909, Special Case 83653–08–308.1, at 9–10. (Emphasis added.)

Inspector McLaughlin recommended that the desires of the Indians to slightly alter the proposed boundaries of the tract of land to be ceded be complied with. In addition to the boundary dispute, another area of major concern to the members of the Oglala Sioux Tribe noted in the report was the disposition of certain timber in the tract to be ceded. Timber was highly prized by the Indians because it was used for fence posts, livestock corrals and log cabins and because it was the only available winter heating fuel and many Indians had no timber on

their allotments. Inspector McLaughlin recommended:

> That the timbered tracts within said County, which have been withheld from allotment for timber reserves, be apportioned as equitably as possible among the Indians whose allotments contain no timber. Doc. 26, *supra*, at 11.

Senator Gamble agreed with Inspector McLaughlin's recommendations and stated:

> . . . Major McLaughlin succeeded in arriving at an *agreement* with the Pine Ridge Indians for the *cession of practically all of the lands covered by the bill* which I introduced during the last session of Congress. Doc. 27, National Archives Records of the Bureau of Indian Affairs, Letter of Sen. Robert J. Gamble, to R. G. Valentine, Commissioner of Indian Affairs, Special Case 83653–08–308.1, Letter No. 81589, Oct. 7, 1909. (Emphasis added.)

Senator Gamble also noted the Inspector's recommendation on timber lands and stated further:

> I regard it as highly important that the wishes of the Indians be complied with, as near as can be, fairly and equitably with proper consideration for the prospective settlers. *Id.*

The Secretary of the Department of the Interior, in his Department Report and Recommendations on Senate Bill 2341, reflected the understanding of the Department and stated:

> Section 1 of the proposed bill provides for the *sale* and *disposal* of all that part of the Pine Ridge Reservation lying and being in Bennett County, except such parts thereof as have been or may hereafter be allotted to Indians. Doc. 31, National Archives Records of the Bureau of Indian Affairs, Report No. 83563, Special Case 83653–08–308.1, at 4. (Emphasis added.)

The Secretary further reported that the Pine Ridge Indians had "acquiesed" in Senate Bill 2341 provided that the timber lands within the area to be ceded be equitably apportioned among the members of the tribe, and provided that minor alterations be made in the metes and bounds description of the tract of land described in the bill. *Id.* at 4.

On February 17, 1910 Senator Gamble on behalf of the Senate Committee on Indian Affairs, reported Senate Bill 2341 out of committee with the suggested amendments and submitted a formal report to Congress. Before this Court focuses on the legislative history of Senate Bill 2341, a comment on the preceding materials is in order. Although this Court has stated its opinion that the language of the Act of May 27, 1910, 36 Stat. 440, on its face, when given its commonly understood meaning, shows a clear Congressional intent to diminish the Pine Ridge Reservation by extinquishing the Indian country character of Bennett County, this Court deems it necessary, because of the importance of the issue presented, to examine the circumstances surrounding the legislation as well as the legislative history of the Act. The preceding materials, although not technically of primary probative value, are one of the richest sources from which to gain a perspective of the period which is a prerequisite to understanding the rationale underlying the provisions of the Act of 1910. This Court cannot remake history, but it has a duty to make every effort to understand history as it relates to this Act, and thereby determine what the intent of Congress was in passing this legislation.

## CONGRESSIONAL STATEMENTS— SENATE BILL 2341

Assumed through the entire discussion contained in Senator Gamble's February 17, 1910, report to Congress on Senate Bill 2341, is the fact that the area under the control of the Oglala Sioux Indians would be diminished and the 1889 boundaries would be changed to mark off that portion of diminished res-

ervation which would remain under the jurisdiction of the Pine Ridge Indians and the federal government, and the tract of land known as Bennett County which would be sold, disposed of and ceded under Senate Bill 2341. Senator Gamble reported:

> The present area of the Pine Ridge Indian Reservation aggregates about 2,765,000 acres. The lands proposed to be opened under the provisions of this bill embrace an area of about 780,000 acres.

> The reservation is yet large, and in the judgment of your committee the surplus and unallotted lands are unnecessary for the use of the Indians. Senate Report No. 69, 61st Cong., 2d Sess. 4-5 (1910).

Senator Gamble reported that because Senate Bill 2341 operated to extinguish the portion of the reservation described and to restore those lands to the public domain, the school land grant provision of the bill met the requirements of the Act which admitted the State of South Dakota to the Union. That Act provides:

> Nor shall any lands embraced in Indian, military, or other reservations of any character be subject to the grants or to the indemnity provisions of this act until the reservation shall have been extinguished and such lands be restored to, and become part of, the public domain. Act of February 22, 1889, 25 Stat. 676.

Senator Gamble further reported:

> It also provides that the Secretary of the Interior, in his discretion, may permit Indians who have allotments within the area proposed to be opened to relinquish such allotments and to receive in lieu thereof allotments anywhere within the reservation proposed to be diminished. S.Rep.No. 69, *supra* at 2-3.

In this report to Congress, Senator Gamble's explanation of the various provisions of the legislation and the effect such provisions would have if enacted

into law, comports with the clear meaning of the operational language on the face of Senate Bill 2341.

Because Senate Bill 2341 continued to be introduced and passed over almost daily in the Senate during the following two weeks, Congressman Burke, also from South Dakota, introduced the proposed legislation to the House of Representatives as H.R. 12440. 45 Cong.Rec. 1135 (1910). In reporting the legislation to the House of Representatives, Congressman Burke explained:

> By the act of March 2, 1889, the great Sioux Reservation was divided into separate reservations, and one was the Pine Ridge Reservation, containing about 2,765,000 acres, and so far no part of it has been disposed of. This bill proposed to *dispose of that portion of the reservation within the boundaries of Bennett County* and contains something less than 800,000 acres. Considerable portions of the tract described in this bill have been allotted to the Indians, and as they have selected the best lands it is difficult to estimate what the proceeds from the sale will be if this bill becomes a law. It is apparent that the unallotted lands ought to be disposed of, so that they may be settled upon and improved. *There is no occasion for continuing a reservation in its present size, and it would be better to reduce it.* If this bill is enacted into law, it would probably be advisable in the near future to authorize a further disposition of that part of the reservation in Washabaugh County. H.Rep. No. 333, 61st Cong. 2d Sess. 2 (1910) (Emphasis added.)

Again, the same provision of the enabling act admitting the State of South Dakota into the Union discussed *supra*, was said by Congressman Burke to be satisfied by the legislation which would operate to extinguish that portion of the reservation described therein and restore that portion to the public domain. In explaining the provision which granted permission to Indians who held allot-

ments within the described tract of land to be sold, disposed of and ceded, to exchange their allotments for allotments within the boundaries of the diminished portion of the reservation, Congressman Burke stated:

> The bill is in the usual form, is carefully safeguarded, and provides that Indians who have taken allotments in the *area proposed to be disposed of* may relinquish such allotments and be reallotted within *the reservation,* if they so elect. H.R.Rep.No. 333, *supra* at 2. (Emphasis added.)

While Congressman Burke evidentially used the term "the reservation" to describe the same area referred to by Senator Gamble as the "diminished reservation", the plain meaning of the clear language on the face of the legislation is susceptible to only one interpretation: the purpose of this legislation was to sell and dispose of all unallotted land within the described portion of the Pine Ridge Reservation, extinguish the Indian country character of the described land, diminish the reservation thereby, and restore the unallotted tracts of land to the public domain.

Senate Bill 2341 was accepted for introduction on February 10, 1910, and Senate debate on the bill began. Senator Bacon of Georgia stated that he was "not familiar" with these matters and requested a clear explanation of the "scope and purpose" of Senate Bill 2341. 45 Cong.Rec. 1501 (1910). Senator Gamble replied:

> I may say in reply, Mr. President, referring to the enabling act providing for the admission of North and South Dakota, Montana, and Washington, that sections 16 and 36 in each township were granted to the separate States in each State for the benefit of common schools; but in the States where there were Indian reservations, it provided that the grant should not take effect until the lands were *open to settlement, or, in other words, became a part of the public domain. By the passage of the bill in question the*

> *lands so opened become a part of the public domain and open to settlement,* and the grant in the enabling act becomes immediately operative and conveys sections 16 and 36 in each township to the State. That was a contract between the Government and the several States as provided by the act of admission. The State of South Dakota is clearly entitled to the school lands, free from any charge to the State. 45 Cong.Rec. 1502 (1910). (Emphasis added.)

In his clear statement of the effect of Senate Bill 2341 to the assembled Senate, Senator Gamble twice defined the term "open to settlement" to mean "become a part of the public domain". This explicit authoritative statement of legislative intent buttresses this Court's conclusion that "the face of the Act", and its "surrounding circumstances" and "legislative history", all point unmistakably to the conclusion that Bennett County was removed from the Pine Ridge Reservation in 1910. cf. Mattz v. Arnett, 412 U.S. 481, 504 n. 22, 93 S. Ct. 2245, 37 L.Ed.2d 92 (1973); DeCoteau v. District County Court, 420 U. S. 425, 431–440, 95 S.Ct. 1082, 43 L. Ed.2d 300 (3/4/75). Not one Senator objected to or otherwise argued against this clear statement of the intended effect of Senate Bill 2341. In fact, shortly thereafter Senator Bacon indicated that he was satisfied with the legislative intent as stated, and that he simply desired that "the facts should be *clearly stated* and that it should be known *exactly* what is the *effect* of the bill." 45 Cong.Rec. 1503 (1910). The legislation ed). Senate Bill 2341 was then ordered to be engrossed for a third reading, was read the third time, and was passed by the Senate without further debate. 45 Cong.Rec. 1503 (1910). The legislation was referred to the House of Representatives on February 7, 1910. 45 Cong. Rec. 1503 (1910). Three days later Congressman Burke reported the bill from the Committee on Indian Affairs. 45 Cong.Rec. 1752 (1910). The

report states that since Senate Bill 2341 is "similar" to H.R. 12440 and affected the "same" land, it should be amended to conform to the House bill. H.R.No. 440, 61st Cong. 2d Sess. (1910). The previous report by Congressman Burke discussed *supra*, and designated H.R.No. 333, was then incorporated into the new report and together designated as H.R. No. 440. On April 27, 1910, Congressman Burke offered a series of minor amendments which were agreed to and the legislation passed the House without debate. 45 Cong.Rec. 5475 (1910). On May 23, 1910, the legislation was forwarded by the Secretary of the Interior to the President who signed Senate Bill 2341 into law as the Act of May 27, 1910, 36 Stat. 440.

## SUBSEQUENT LEGISLATION

Although later legislative attempts to further diminish the size of the Pine Ridge Reservation are largely irrelevant to the issue before the Court in this case, the surrounding circumstances of such later attempts provide relevant evidence of an understanding among all parties concerned that Bennett County ceased to be within the boundaries of the Pine Ridge Reservation in 1910. As early as January of 1910, efforts were being made to dispose of that portion of the Pine Ridge Reservation located within Washabaugh County. *See,* H.R.Rep. 333, *supra.* On April 6, 1911, Senator Gamble introduced Senate Bill 111 to:

> . . . sell and dispose of all that portion of the Pine Ridge Indian Reservation, in the State of South Dakota, lying and being in Washabaugh County and described as follows, to wit [metes and bounds description of Washabaugh County]. Doc. 42, National Archives Records of the Bureau of Indian Affairs, Special Case 83653–08–308.1, Senate Bill 111, Special No. 42265, April 6, 1911, at 1.

The metes and bounds description in Senate Bill 111 refers to and describes the township line between townships thirty-nine and forty as the "boundary line", which corresponds exactly to the boundary line described in the 1910 Act, and is followed by a second reference to "said named last boundary line." Thus, on the face of Senate Bill 111, drafted in 1911, Senator Gamble expressed his understanding that the Act of April 27, 1910, 36 Stat. 440, changed and diminished the 1889 boundaries of the Pine Ridge Reservation.

The transcripts of the 1911 negotiations on Senate Bill 111 disclose that each member attending the council fully appreciated the importance of the event and realized that Washabaugh County would no longer be a part of the reservation if the bill was enacted. Tribal leaders present stated their understanding that the Act of 1910 effected a sale of the unallotted lands in Bennett County and removed Bennett County from the reservation:

> Iron Crow: We want to know what benefit it would bring us to have Washabaugh County open. If we derive no benefit from the opening of Bennett County we would not want to have Washabaugh County open. In regard to this opening of Washabaugh County I wish to say that this land lying *inside* of the Pine Ridge Reservation we claim to be our land. Doc. 46, *supra,* at 3–4. (Emphasis added.)

> Iron Crow: We would like to wait until all the money is in for the *sale of Bennett County* and the expenses and everything are paid so that we may see what benefit we will get from Bennett County. *Id.* at 4. (Emphasis added.)

> Jack Red Cloud: We are waiting to see about Bennett County and whether we are going to derive any benefit from the *sale of Bennett County. Id.* at 5. (Emphasis added.)

> John Blunthorn: Now that you have passed the Bill we want to know what benefit we will get from Bennett County: *The Reservation is getting pretty small.* . . . *Id.* at 7 (Emphasis added.)

Bear Nose: My friend, how is it that you make a treaty and then try to jump over this treaty and then try to make some more? *Id.* at 10.

Turning Hawk: You went down to Pass Creek and had a council there and in that council they agreed in selling *Bennett County. Id.* at 11. (Emphasis added.)

More significant, however, is the very detailed and unequivocal description of what would be the diminished Pine Ridge Reservation if Senate Bill 111 affecting Washabaugh County became law:

Inspector McLaughlin: In this pending legislation you people of Pine Ridge have been specially favored for the reason that the Bill provides for the opening of only about *one-fourth* of your *original* reservation and leaving you about *one-half as diminished reservation* after Bennett County and Washabaugh County would be open, while I have bills with me now, for the opening of all the Rosebud, Lower Brule, Crow Creek, Cheyenne River and Standing Rock Reservations, which Bills provide for the opening of all the surplus lands of these Reservations while *you are asked for only one-fourth, the northeast corner. Id.* at 16. (Emphasis added.)

By use of the term "original reservation" Inspector McLaughlin meant the area within the 1889 boundaries. Bennett County contains one-fourth of that area and Washabaugh County also contains one-fourth of that 1889 area. In this statement made in 1911, Inspector McLaughlin explained that if Senate Bill 111 would be enacted Washabaugh County, the northeast one-fourth, would be sold and disposed of. This would leave the Indians with only one-half of their original 1889 reservation as "diminished reservation" because Bennett County, the other one-fourth of the original 1889 reservation, had been sold and removed from tribal jurisdiction in 1910. This statement also shows that Inspector McLaughlin understood and represented

to the Pine Ridge Indians that the phrase "diminished reservation" meant that the size of the reservation *and* the reservation boundaries would be diminished when Congress passed the Act. *See,* DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (3-4-75). The Pine Ridge Reservation as defined in 1889, by 25 Stat. 888, contained approximately 2,765,000 acres. S.Rep.No. 910, 60th Cong. 2d Sess., p. 1 (1909); the area of land contained in Bennett County is approximately 765,000 acres. S.Rep.No. 69, 61st Cong. 2d Sess. 4-5 (1910). If the term "diminished reservation", as used on the face of the 1910 Act, means that the size of the reservation *and* the reservation boundaries were diminished when Congress passed the Act, then the Pine Ridge Reservation would have been reduced to 2,000,000 acres after 1910. In 1912, Senator Gamble in his report on Senate Bill 111 to the assembled Congress, confirmed that the 1910 Act had in fact diminished the boundaries of the Pine Ridge Reservation by removing all of Bennett County therefrom:

The present area of the Pine Ridge Reservation aggregates 2,000,000 acres. Sen.Rep.No. 538, 62d Cong. 2d Sess. 4 (1912).

This statement to Congress is clear probative evidence that the size, area, and boundaries of the Pine Ridge Reservation in 1912 did not include Bennett County.

The Commissioner of Indian Affairs recognized that the Pine Ridge Reservation had been diminished in his Annual Report for 1914:

There is no authority of law to dispose of any part of the *diminished reservation* other than by allotments, and the land suitable for this purpose is now very scarce. Rep. of the Comm. of Indian Affairs, 46 (1914). (Emphasis added).

In two letters dated March 4, 1916, to the Chairman of the House and Senate Committees on Indian Affairs, the Secretary of the Interior, Franklin K. Lane,

referred to Bennett County as *"formerly a part of the Pine Ridge Reservation."* Doc. 57, National Archives Records of the Bureau of Indian Affairs, Letters Received: Special Case 83653–08–308.1, March 4, 1916, at 4, 10. (Emphasis added.) In addition, the same description was contained in legislation. H.R. 12777 dated March 6, 1916, provides:

> Authorizing allotments to members of the Pine Ridge Sioux Tribe from the surplus unentered lands in Bennett County, South Dakota, *formerly* a part of the Pine Ridge Reservation. H.R. 12777, Doc. 57, *supra*, at 7, 14.

Shortly thereafter a printed bill was prepared in the House and the Senate entitled:

> A BILL Authorizing allotments to members of the Pine Ridge Sioux Tribe from the surplus unentered lands in *Bennett County, South Dakota, formerly a part of the Pine Ridge Reservation.* H.R. 12777, Doc.No. 57 at 2. (Emphasis added.) S. 5051, Doc.No. 57 at 8. (Emphasis added.)

On March 6 and 14, respectively, each bill was introduced in the House and Senate:

> By Mr. STEPHENS of Texas: A bill (H.R. 12777) authorizing allotments to members of the Pine Ridge Sioux Tribe from surplus unentered lands in *Bennett County, S. Dak., formerly a part of the Pine Ridge Reservation;* to the Committee on Indian Affairs. 53 Cong.Rec. 3644 (1916). (Emphasis added.)

> By Mr. JOHNSON of South Dakota: A bill (S5051) authorizing allotment to members of the Pine Ridge Sioux Tribe from the surplus unentered lands in *Bennett County, S. Dak., formerly a part of the Pine Ridge Reservation;* to the Committee on Indian Affairs. 53 Cong.Rec. 4050 (1916) (Emphasis added).

In Antoine v. State of Washington, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (2–18–75), the Court equates the term "former Indian reservation" with "ceded land" and cites with approval Seymour v. Superintendent, 368 U.S. 351, 354, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962) to clarify "unallotted non-Indian land in what was once the north half of the Colville Indian Reservation." 420 U.S. at 196, 95 S.Ct. at 946. In *Seymour,* the Court interpreted "diminished" under the 1892 Act to mean that the north half "should be 'vacated and restored to the public domain,'" but that the south half "or the 'diminished Colville Indian Reservation' . . . was 'still reserved by the Government for [the Colville Indians'] use and occupancy.'" 368 U.S. at 354, 82 S.Ct. at 426. *See also,* Cook v. State of South Dakota, S.D., 215 N.W.2d 832 (1974).

The pattern which emerges is consistent. The circumstances surrounding the Act of May 27, 1910, 36 Stat. 440, which include relevant evidence from later attempts to further reduce the size of the Pine Ridge Reservation, consistently display an understanding among all parties that the "diminished" Pine Ridge Indian Reservation boundaries did not include, after 1910, Bennett County "formerly a part of the Pine Ridge Reservation." If this were not true it would not have been necessary to introduce H.R. 12777 in 1916. In this bill, which was never enacted, the tribe in effect was asking Congress for authority to reenter the unallotted lands of Bennett County and establish additional Indian allotments on land that had not yet been sold to settlers. If the 1889 boundaries of the Pine Ridge Reservation had not been diminished as the tribe argues here, there would have been no need for H.R. 12777. Doc. 57, H.R. 12777, March 6, 1916. These subsequent legislative materials consistently point to the conclusion that the 1889 boundaries of the Pine Ridge Reservation were diminished by the 1910 Act to exclude Bennett County.

## ALLOTMENT EXCHANGE PROVISION

The Act of May 27, 1910, 36 Stat. 440, contains a provision which allowed Indi-

ans who held allotments located within Bennett County, the tract to be ceded, to exchange their allotment for one located within the diminished reservation. The provision provides:

> *Provided,* That any Indians to whom allotments have been made on the *tract to be ceded* may, in case they elect to do so before said lands are offered for sale, relinquish same and select allotments in lieu thereof on the *diminished reservation.* Act of May 27, 1910, 36 Stat. 440, 441. (Emphasis added.)

It is clear that this provision contemplated three distinct areas: (1) land within the diminished reservation; (2) unallotted land within the ceded tract; and (3) Indian allotments within the ceded tract.

The operative language of the Act of 1910, set out *supra,* provides for the sale, disposal and cession of all unallotted lands within that part of the reservation to be ceded as described in the Act. The United States Supreme Court in DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (3–4–75), defined "diminished" in light of the Sisseton-Wahpeton Agreement and held:

> It is true that the Sisseton-Wahpeton Agreement was unique in providing for cession of *all,* rather than simply a major portion of, the affected Tribe's unallotted lands. But, as the historical circumstances make clear, this was not because the Tribe wished to retain its former Reservation, *undiminished,* but rather because the Tribe and the Government were satisfied that retention of allotments would provide an adequate fulcrum for Tribal affairs. In such a situation, *exclusive tribal and federal jurisdiction is limited to the retained allotments.* 18 U.S.C. § 1151(c). See United States v. Pelican, 232 U.S. 442, 34 S.Ct. 396, 58 L. Ed. 676. With the benefit of hindsight, it may be argued that the Tribe and the Government would have been better advised to have carved out a *diminished reservation,* instead of or in addition to the retained allotments. But we cannot rewrite the 1889 Agreement and the 1891 statute. 420 U.S. at 446, 95 S.Ct. at 1094. (Emphasis added.)

In this holding the Court clearly equated "diminished reservation" with "diminished reservation boundaries." The only difference between the provision being interpreted by the Court in *DeCoteau* and the provision under consideration here is that in *DeCoteau,* the Act provided for cession of *all* unallotted reservation lands and the *DeCoteau* Court held that the original exterior boundaries of the Sisseton-Wahpeton Reservation were extinguished entirely. The only exclusive federal and tribal jurisdiction remaining over the ceded former reservation lands is limited to the retained allotments under 18 U.S.C. § 1151(c). In the instant case this principle applies to Bennett County, the area described in the 1910 Act to be sold, disposed of and ceded. In the judgment of this Court, the only exclusive federal and tribal jurisdiction remaining in Bennett County is over the *allotments retained* within this ceded area under 18 U.S.C. § 1151(c). Because the effect of the Act construed in *DeCoteau* was to extinguish tribal jurisdiction over all former reservation lands except for retained allotments, the *DeCoteau* Court felt that the tribe "would have been better advised to have carved out a *diminished reservation,* instead of or in addition to the retained allotments." *Id.* In the Act of 1910 under consideration here the Oglala Sioux Tribe did just that. The tribe retained a diminished reservation in the sense that the term is used by the *DeCoteau* Court. 18 U.S.C. § 1151(a) applies only to the remaining decreased reservation area because the 1889 boundaries of the Pine Ridge Reservation were changed to exclude the land described in the Act of May 27, 1910, 36 Stat. 440, the moment the presidential proclamation was signed.

In the judgment of this Court, the agreement entered into between the tribe and the government and embodied in the Act of 1910, terminated exclusive tribal and federal jurisdiction over the *unallotted* lands within Bennett County and restored these lands to the public domain and to the jurisdiction of South Dakota. It is also the judgment of this Court that under 18 U.S.C. § 1151(a), tribal and federal jurisdiction remains over the land within the diminished reservation boundaries which consists of the area within the 1889 boundaries minus all of the land allotted and unallotted within Bennett County.

## SCHOOL LAND GRANT PROVISION

The school lands provision of the 1910 Act, 36 Stat. 440, is further evidence of Congress' intent to vest jurisdiction over unallotted ceded lands in the State of South Dakota. The provision reads:

Sec. 8. That sections sixteen and thirty-six of the land in each township within the tract described in section one of this Act shall not be subject to entry, but shall be reserved for the use of the common schools, and paid for by the United States at two dollars and fifty cents per acre, and the same are *hereby granted* to the State of South Dakota for such purpose. Act of May 27, 1910, 36 Stat. 440, 442. (Emphasis added.)

As is explained in the Senate and House Reports, the necessity for this school land grant was to comply with the enabling act which admitted South Dakota to the Union:

Nor shall *any lands* embraced in Indian, military, or other reservations of any character be subject to the grants or to the indemnity provisions of this act *until the reservation shall have been extinguished and such lands be restored to, and become a part of the public domain.* Act of February 22, 1889, 25 Stat. 676. (Emphasis added.)

Unless the 1910 Act, 36 Stat. 440, effectively extinguished the reservation or Indian country character of the land to be ceded and restored this land to the public domain, the enabling act would not be complied with. In DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (3-4-75), the Court considered the school lands provision of the 1891 Act, § 30, 26 Stat. 1039, which reads:

. . . excepting the sixteenth and thirty-sixth sections of said lands, which shall be *reserved* for common school purposes, and be *subject to the laws of the State wherein located.* 1891 Act, § 30, 26 Stat. 1039. (Emphasis added.)

The *DeCoteau* court ruled the provision irrelevant to the jurisdictional issue in that case. The provision construed in *DeCoteau,* however, is entirely different in character from the provision in this case. Because this is a *grant* of land the enabling act must be complied with. Unlike *DeCoteau,* there exists in this case legislative history demonstrating that this school grant provision was an integral part of the cession agreement. Inspector McLaughlin read and explained this provision to the tribal council during negotiations on both Senate Bill 7380 and Senate Bill 2341, and the tribe gave its approval to and "acquiesed in" Senate Bill 2341. Doc. 31, Report No. 83563, *supra,* at 4. Congressman Burke explained to the House of Representatives and Senator Gamble explained to the Senate that this clause was necessary to conform with the provisions of the act admitting the State of South Dakota into the Union. S.Rep.No. 910, *supra,* at 2; S.Rep.No. 69, *supra,* at 4–5; H.Rep.No. 333, *supra,* at 2. In order to comply with the enabling act, a grant of school land must be conditioned on extinguishment of the reservation character of the tract of land to be ceded and restoration of that tract to the public domain. Rosebud Sioux Tribe v. Kneip, 375 F.Supp. 1065 (1974). *See also,* 38 Cong.Rec. 1423 (1904); 35 Cong.Rec. 3187 (1902); H.R.Rep.No. 7613, 59th Cong., 2d Sess. pp. 3–4 (1907); S.Rep. No. 6838, 59th Cong., 2d Sess., p. 3

(1907); S.Rep.No. 887, 60th Cong. 2d Sess. p. 2 (1909); H.R.Rep.No. 429, 61st Cong., 2d Sess. p. 2 (1910) for congressional statements and legislative history concerning similar school land grant provisions contained in the 1904 Act (Gregory County), the 1907 Act (Tripp and Lyman Counties), and the 1910 Act (Mellette County).

## CEDE AND TRUST PROVISION

■ Counsel for the tribe has argued that the provision of the 1910 Act which established a trust fund based upon the uncertain future sales of ceded land to settlers, in some manner distinguishes the 1910 Act in this case and the 1891 Act construed by DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (3–4–75), wherein a sum certain was paid by the government and placed in trust for members of the Sisseton-Wahpeton tribe. The petitioner's argument is contrary to the facts and authorities set forth in 18 S.D.Law Rev. 85 (1973), cited with approval by this Court in Rosebud Sioux Tribe v. Kneip, 375 F.Supp. 1065 (1974). Furthermore, and of greater significance, the Eighth Circuit Court of Appeals cited 18 S.D.Law Rev. 85 (1973), with approval and rejected a similar argument in United States ex rel. Condon v. Erickson, 478 F.2d 684 (8th Cir. 1973), and stated:

> Appellee thinks it significant that the 1908 Act provided for the proceeds from the sale of the lands to be deposited into the Treasury of the United States and credited to the Indians as was the case in the 1906 (*Seymour*) and 1910 (*New Town*) Acts. This method contrasts with prior acts wherein payment for the lands was made directly to the Indians. *It has been aptly pointed out, however, that this was simply a new method utilized by a Congress that no longer favored purchasing Indian lands and providing them free of cost to settlers.* "New Town et al: the Future of an Illu-

sion," 18 South Dakota L.Rev. 85, 94–98 (1973). 478 F.2d at 687.

In essence, the only difference this Court detects between the two methods of opening ceded reservation lands is that in the certain-sum-in-trust method, all beneficial interest of the tribe in the land ended the moment the legislation became law. In the uncertain-sum-in-trust method, a beneficial interest remained in the tribe until the land was paid for. In both methods, however, the former exterior boundaries were extinguished the moment the President signed the proclamation opening the area for sale to the public.

Counsel for the tribe has argued that this construction is incorrect, but the case authority cited by the tribe in support of its sum-certain position, Ash Sheep Company v. United States, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920), undermines the crux of its argument and unequivocally supports this Court's construction.

In *Ash Sheep*, the issue decided is directly on point with the issue presented in this case: whether the Crow Tribe retained a beneficial interest in that portion of the reservation ceded in trust until the land had been disposed of under the terms of the 1904 Act which opened the ceded area to the public for sale. The *Ash Sheep* Court held that the Crow Tribe did retain a beneficial interest and stated:

> . . . until sales should be made, any benefits which might be derived from the use of the lands would belong to the beneficiaries and not to the trustee, and that they did not become "public lands" in the sense of being subject to sale, or other disposition, under the General Land Laws. . . . They were subject to sale by the government, to be sure, but in the manner and for the purposes provided for in the special agreement with the Indians, which was embodied in the Act [of] April 27, 1904 . . . .. Thus we conclude that the lands described in the bill were "Indian lands"

when the company pastured its sheep upon them . . . 252 U.S. at 166, 40 S.Ct. at 243.

The *Ash Sheep* opinion was directed to the status of the land *prior* to the President's proclamation opening the ceded area to the public for sale and settlement:

. . . at the time no settlement or entries thereon had been authorized under acts of Congress. 252 U.S. at 166–167, 40 S.Ct. at 243.

The *Ash Sheep* holding that the ceded Crow lands were not in all respects "public lands" *prior* to proclamation opening the lands to the public for sale and settlement, is certainly no indication that these ceded lands were to remain within the exterior boundaries of the Crow Reservation *after* proclamation. In fact the *Ash Sheep* Court stated otherwise:

The agreement embodied in this Act of Congress provided for a *division* of the Crow Indian Reservation in Montana on *boundary lines* which were described . . . 252 U.S. at 164, 40 S.Ct. at 242. (Emphasis added.)

The boundary lines referred to by the Court are specifically mentioned in five different places in the 1904 Act. *See*, 33 Stat. 352–360, Arts. 4, 9, Secs. 3, 4 (1904). Thus, the 1904 Act is susceptible of only one construction: at some point in time the exterior boundaries once encompassing the ceded area were necessarily extinguished.

In light of the fact that the 1904 provision is identical to that which established the trust relationship based upon uncertain future sales of land to settlers in the instant case, the argument of the tribe that this arrangement could not have been intended to extinguish exterior boundaries is without merit. In fact, the entire thrust of *Ash Sheep* is addressed to the force and effect of this very provision and set out in *Ash Sheep* as follows:

That nothing in this Act contained shall in any manner bind the United States to purchase any portion of the land herein described, except sections sixteen and thirty-six or the equivalent in each township, or to dispose of said land except as provided herein, or to guarantee to find purchasers for said lands or any portion thereof, it being the intention of this Act that the United States shall act as trustee for said Indians to dispose of said lands and to expend and pay over the proceeds received from the sale thereof only as received, as herein provided. 33 Stat. pp. 352, 361, c. 1624. 252 U.S. at 165, 166, 40 S.Ct. at 242. *See* identical provision in Act of May 27, 1910, 36 Stat. 440.

■ Therefore, in accordane with *Ash Sheep* and *Condon*, it is the judgment of this Court that Congress, in this provision of the 1910 Act, simply utilized a new method of opening Indian lands to sale and settlement by the public, and of restoring opened lands to the public domain. Under this method the exterior boundaries of the ceded former Indian land were extinguished, as well as tribal and federal jurisdiction over the unallotted land within the ceded area, at the moment the President signed the proclamation. The Indians, however, retained a beneficial interest in the ceded lands until such former Indian land was sold and paid for. This holding agrees with this Court's finding in Rosebud Sioux Tribe v. Kneip, 375 F.Supp. 1065 (1974), wherein this Court set forth at length the congressional statements and other legislative history relating to the congressional change in policy which resulted in this method of opening Indian lands and restoring such land to the public domain. *See* H.R.10418, 58th Cong., 2d Sess., Jan. 21, 1904, p. 2; 35 Cong.Rec. 3187–88 (1902); 35 Cong.Rec. 4801–02, 4807 (1902); 38 Cong.Rec. 1423 (1904).

## CARTOGRAPHIC RECORD

■ The jurisdictional history of the ceded area subsequent to passage of the Act under consideration was treated

as a significant fact by the United States Supreme Court in DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (3-4-75):

> Until the Court of Appeals altered the status quo, South Dakota had exercised jurisdiction over the unallotted lands of the former reservation for some 80 years. *Id.* 449, 95 S.Ct. at 1095.

In the instant case this Court finds that South Dakota has exercised uninterrupted, unquestioned jurisdiction over the unallotted lands in Bennett County for 65 years, and continues to do so. The Official Cartographic Record of Indian Reservations supports this finding and shows that the Department of the Interior, General Land Office, and the Bureau of Indian Affairs since 1910 has treated Bennett County as former reservation area.

Since the early 1890s, the Official Map of the Office of Indian Affairs displaying the size and shape of all Indian reservations within the United States has been prepared and updated each year under the authority and direction of the Commissioner of Indian Affairs and appended to his Annual Report. The exterior boundaries of each reservation were depicted by solid lines and the reservation area within was marked in orange color and superimposed upon the map of the United States. When a treaty or cession disestablished a reservation or a portion of one, and the area subsequently opened to the public, the ceded area was no longer color coded as reservation. For example, this treatment was accorded changes in the Great Sioux Reservation in 1888 and 1889, as well as the Oklahoma Reservation cessions between 1891-1900. From the early 1890s to 1908, exterior boundaries of the Pine Ridge Reservation were drawn around what is now Bennett, Washabaugh, and Shannon Counties and contained approximately 2,765,000 acres and were color coded as reservation. The 1909 Official Map of Indian Reservations excluded from the Rosebud Reservation Gregory and Tripp Counties and labeled these counties "Opened" reservation. The 1912 Official Map excluded Bennett County from the color coded reservation area and labeled Bennett County "Opened" reservation. The remainder of the Pine Ridge Reservation not affected by the Act of May 27, 1910, 36 Stat. 440, is color coded as "Indian Reservation". In 1918 the Official Map of Indian Reservations changed again. Bennett County, affected by the 1910 Act, and the four counties of Gregory, Tripp, Lyman and Mellette, affected by the Rosebud Acts, were shaded in grey and labeled "Former Reservation". *See* the identical treatment given this record in *DeCoteau,* n. 27.

The Office of Indian Affairs compiled and published another separate set of Official Maps which were revised periodically rather than annually, for each major reservation in the United States. The 1910 map shows Bennett County within the exterior boundaries of the Pine Ridge Reservation in the small index map in the upper left corner, but excludes Bennett County from the exterior boundaries of the reservation on the official scale map. Across Bennett County is handwritten the phrase "Opened to Settlement". Along the exterior boundaries of the reservation which exclude Bennett County are printed the words "Diminished Reservation", and along the boundaries of Bennett County are printed the words "Ceded Lands." Doc. 6834, National Archives, Record Group 75. Charles H. Bates, Special Allotting Agent of the Bureau of Indian Affairs, plotted the allotments completed as of 1913 on a copy of the 1910 Official Map. On the official scale map Bennett County is excluded from the exterior boundaries of the Pine Ridge Reservation and across Bennett County is written "Opened to Homestead Settlement." Along the exterior boundaries of the reservation, which excludes Bennett County, are written the words "Diminished Reservation", and along the boundaries of Bennett County are written the

words "Ceded Lands." Doc. 9365, National Archives, Record Group No. 75. It is significant to note that on the 1914 Official Map of the Pine Ridge Indian Reservation, drawn and compiled by Frazer C. Hilder, C. E., Bennett County is excluded from the exterior boundaries of the reservation in the small index map in the upper left corner, and the reservation is shown to include only Shannon, Washington, and Washabaugh Counties. On the larger scale map the 1910 phrase "Opened to Homestead Settlement" has been replaced by the word "Ceded" written across Bennett County. Along the boundaries of Bennett County are printed the words "Ceded Lands" and along the reservation boundaries, which exclude Bennett County, are printed the words "Diminished Reservation". Doc. 9715, National Archives, Record Group No. 75. The 1917 Official Map of the Pine Ridge Indian Reservation remained unchanged from the 1914 map. Doc. 9717, National Archives, Record Group 75. Another map drawn during the same period excludes Bennett County from the exterior boundaries of the Pine Ridge Reservation. Doc. U.S. 28, National Archives, Record Group 49.

Other official maps of this period are those published periodically under the direction of the General Land Office which is responsible for the cartographic record of the United States. Again, the treatment accorded the Pine Ridge Reservation in these documents reflects the decisions of Congress and the understanding of the agencies that the Act of 1910 diminished the boundaries of that reservation by excluding Bennett County therefrom. Before 1910 the title "Pine Ridge Indian Reservation" extended over the entire area enclosed by the 1889 boundaries. On the 1918 revision, the same title was relocated so as not to extend into Bennett County. Doc. 49, National Archives Cartographic Record (1918). This cartographic record of the Pine Ridge Reservation shows a consistent pattern and is probative evidence

that the Act of 1910 diminished the boundaries of the reservation and restored the ceded land, Bennett County, to the public domain.

CONCLUSION

The language used on the face of the 1910 Act, when given its plain and ordinarily understood meaning, shows a clear congressional intent to sell and dispose of all unallotted lands within the described portion of the Pine Ridge Reservation, to diminish the 1889 boundaries of the reservation by excluding all of Bennett County therefrom, and to restore the unallotted lands within Bennett County to the public domain. Contrary to the situation presented in Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), which militated persuasively against a finding of termination, in this case "the face of the Act" and its "surrounding circumstances" and "legislative history", all point unmistakably to the conclusion that South Dakota has had since 1910, and continues to have, jurisdiction over all unallotted lands within Bennett County. DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (3–4–75). The 1910 Act was not a unilateral action by Congress but the result of a previously negotiated agreement, to which the tribe gave their informed consent. The "familiar forces" recognized in DeCoteau were at work upon the Pine Ridge Reservation and pressure from white farmers, merchants and railroad men caused Congressmen to covet Indian lands. The authority was available under the 1887 General Allotment Act, Section 12 of the 1889 Act, and under Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L. Ed. 299 (1903), to sell and dispose of surplus Indian lands to white settlers, with the proceeds of these sales being held in trust for the Indians' benefit. Mattz v. Arnett, 412 U.S. 481, 496, 93 S.Ct. 2245, 2253, 37 L.Ed.2d 92 (1973).

**500**

The language of the 1910 agreement embodied in the 1910 Act is precisely suited to this purpose and is comparable to the language of 26 Stat. 1040 which applies to the Crow Indian Reservation and is cited with approval by the De-Coteau Court. 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (3–4–75), at n. 22. The language used in the provisions of the Act, the understanding of those provisions by Inspector McLaughlin and the Indians during negotiations, the legislative history, subsequent legislative enactments, and the cartographic record all establish a consistent pattern that unmistakably points to a congressional intent and purpose to diminish the reservation boundaries by excluding Bennett County therefrom, and to restore the ceded unallotted lands within Bennett County to the public domain and to the jurisdiction of South Dakota. Tribal and federal jurisdiction remains under 18 U.S.C. § 1151(a) over the diminished Pine Ridge Reservation which consists of the area within the 1889 boundaries minus all allotted and unallotted land within Bennett County. Tribal and federal jurisdiction remains over Indian allotments retained within Bennett County under 18 U.S.C. § 1151(c). The Act of May 27, 1910, 36 Stat. 440, restored all unallotted lands within Bennett County to the public domain and therefore the State of South Dakota has jurisdiction over this former reservation land. To paraphrase the *DeCoteau* Court, in the agreement of 1909 and in the 1910 Act Congress and the Oglala Sioux Tribe spoke clearly. Some might wish that they had spoken differently, but this Court cannot remake history. South Dakota has exercised unquestioned jurisdiction over the non-Indian lands within Bennett County for some sixty-five years. For this Court to reinstate the entire 1889 reservation on the theory that mere retention of allotments in the ceded area was ill advised, would carry this Court well beyond the rule by which legal ambiguities are resolved to the benefit of the Indians. The petitioner's Writ is therefore denied.