454 F.2d 121
 THE CITY OF NEW TOWN, NORTH DAKOTA, a Municipal Corporation, Appellant,
v.
The UNITED STATES of America and Rogers C. B. Morton,
Secretary of the Interior, The Three Affiliated
Tribes, Fort Berthold Reservation, Appellees.
 No. 71-1147.
 United States Court of Appeals,
Eighth Circuit.
 Jan. 17, 1972.
 
 Jon R. Kerian, Bosard, McCutcheon, Kerian & Schmidt, Minot, N. D., for appellant.
 Thomas L. Adams, Jr., Atty., Dept. of Justice, Washington, D. C., Shiro Kashiwa, Asst. Atty. Gen., Harold O. Bullis, U. S. Atty., Fargo, N. D., Robert S. Lynch, Atty., Dept. of Justice, Washington, D. C., for appellee United States.
 Jerry C. Straus, Washington, D. C., for the Three Affiliated Tribes; Wilkinson, Cragun & Barker, Charles A. Hobbs, R. Anthony Rogers, Washington, D. C., of counsel.
 Before GIBSON, BRIGHT and ROSS, Circuit Judges.
 GIBSON, Circuit Judge.
 
 
 1
 This is an appeal by the plaintiff City of New Town, North Dakota, from a summary judgment[1] entered in favor of the defendants, the United States of America, the Secretary of the Interior, and the Three Affiliated Tribes of the Fort Berthold Reservation,[2] declaring (under the Federal Declaratory Judgment Act, 28 U.S.C. Secs. 2201 et seq.) that the Act of June 1, 1910, 36 Stat. 455 (hereinafter referred to as the 1910 Act), and Acts supplementary thereto, did not change the boundaries of the Fort Berthold Indian Reservation, North Dakota, as established by the Act of March 3, 1891, 26 Stat. 1032. We affirm.
 
 
 2
 The pertinent facts are not in dispute. The boundaries[3] of the Fort Berthold Reservation were established by the Act of March 3, 1891, 26 Stat. 1032. The reservation as originally established is shown on the map attached as an appendix to this opinion; it is subdivided (for the purpose of this case) into three areas, A, B, and C, the relevance of which will be subsequently explained.
 
 
 3
 By the 1910 Act, Congress opened certain lands of the reservation for homesteading. While we will discuss the 1910 Act in more detail later in this opinion, certain practical effects following the Act may be outlined here. The Act in general dealt with the lands north and east of the Missouri River; the lands south and west of the river (Area C) have always been conceded to be a reservation for the Indians and are not in controversy here. The lands north and east of the river are divided into Area A and Area B, a division which is purely arbitrary for the purposes of this suit. Most of the land in Area B was allotted to individual Indians, and most of the land in Area A was settled by white homesteaders following the 1910 Act. For some time following the 1910 Act, it was apparently thought that only Area C remained as the reservation. However, by 1938 it was apparently generally recognized that Area B was also part of the reservation, but as a matter of general practice, Area A has not been treated as belonging on the reservation.
 
 
 4
 The result of this practice has been that the City of New Town, as well as other municipalities[4] located within Area A, has exercised criminal jurisdiction over Indians committing offenses within their general jurisdiction. However, if Area A is actually a part of the reservation, then Indians living within the reservation are subject only to the jurisdiction of the tribal courts or in the case of major crimes to the jurisdiction of the federal district courts.[5]
 
 
 5
 The question of the reservation's boundaries as it affected criminal jurisdiction arose in 1962 when one Glen Snowbird, an Indian, was in state custody on a charge of assault with a dangerous weapon, the crime having been committed in New Town. In response to an inquiry, the Deputy Commissioner of Indian Affairs, John Crow, wrote a letter giving an opinion as to the reservation's boundaries, concluding that the City of New Town was not within the reservation and thus that it had jurisdiction over the offense. Generally speaking, the import of the Crow letter was that Congress had intended by the 1910 Act to diminish the Fort Berthold Reservation by removing from it all the land north and east of the Missouri River, but because of subsequent administrative practice it was now established that the reservation boundaries included the area designated as Area B on the map. However, administrative practice had been not to treat Area A as part of the reservation, and therefore the Crow letter concluded that Area A was not part of the reservation and thus that the City of New Town had jurisdiction over the offense. It may be noted that Crow was not a lawyer and did not occupy a position established for the purpose of rendering legal advice in the Department of the Interior.
 
 
 6
 Apparently the matter rested until 1970, when the Solicitor for the Department of the Interior issued a carefully considered opinion which concluded that the 1910 Act had not altered the boundaries of the reservation, that no authority existed for the administrative alteration of reservation boundaries, and that therefore the boundaries remained as established under the Act of March 3, 1891. Subsequently, the City of New Town instituted the instant declaratory judgment action seeking a declaration of the boundaries of the reservation, alleging that as a result of the Solicitor's opinion its municipal powers had been usurped and it was no longer able to assert jurisdiction over Indians within its city limits. As noted above, summary judgment was entered in favor of the defendants, and the City of New Town appeals.
 
 
 7
 New Town bases its argument that it is not within the limits of the Fort Berthold Reservation primarily on provisions in the 1910 Act and Acts supplementary thereto. We now turn to a general summary of that Act.
 
 
 8
 By Section 1 of the statute, the Secretary of the Interior was authorized and directed to survey all of the unsurveyed part of the reservation, and "to sell and dispose of, as hereinafter provided, all the surplus unalloted and unreserved lands within that portion of said reservation lying and being east and north of the Missouri River." It is to be specifically noted that the surplus lands which were thus to be disposed of might be located throughout Areas A and B, and no distinction was made in this regard. Furthermore under this section, the Secretary was directed to have a geological examination made of all the lands in this area and if any were found to bear coal or other minerals, they were to be reserved from disposition. Pursuant to this authority, some 238,082 acres of land were reserved as being valuable for coal; some 110,000 of these acres were in Area A.[6]
 
 
 9
 Section 2 of the statute authorized an allotment of 160 acres of agricultural land or 320 acres of grazing land to each Indian living on the reservation, these allotments to be in addition to allotments which had been previously authorized. These additional allotments were limited to that portion of the reservation lying west and south of the Missouri River, and that portion east and north of the river comprising Area B. This is the only section of the statute making any distinction between Area A and Area B. Furthermore, under prior statutory authority allotments had been made to individual Indians throughout Areas A and B, and these prior allotments were not affected by the 1910 Act.
 
 
 10
 Sections 3 and 4 of the statute authorized the Secretary to set aside lands for agency, school, religious, and farm purposes to be maintained for the benefit of the Indians. No distinction is made between Areas A and B, and the record before us does not reveal where, if at all, these lands were set aside.
 
 
 11
 Section 5 of the statute authorized the Secretary to set aside lands which were valuable for power or reservoir sites. Again, no distinction was made between Areas A and B, and the land so set aside was in Area A.
 
 
 12
 Section 6 authorized the Secretary to designate townsites and to lay them out in lots and blocks as authorized by the townsite laws, with the net proceeds from the sale of the lots to be credited to the Indians. No distinction was made in the statute between Areas A and B, and the townsites to set aside were located in Area A.[7]
 
 
 13
 Section 7 provided for the establishment of a commission to appraise and classify the lands. One of the members of the commission was to be a member of the tribe.
 
 
 14
 Section 8 granted school lands to the State of North Dakota. These lands were selected by the State over a period of time, and were selected throughout Areas A and B. The section made no distinction between Areas A and B.
 
 
 15
 Section 9 provided for the disposition of surplus lands (i. e., lands not set aside under other provisions of the Act) under the provisions of the homestead and townsite laws of the United States. The section made no distinction between Areas A and B, and homesteading in fact occurred throughout Areas A and B, although the bulk of the homesteads were established in Area A due to the fact that a large portion of Area B was allotted to individual Indians under Section 2 of the Act, or was reserved as coal lands.
 
 
 16
 Section 10 authorized the Secretary to set aside as a tribal forest reserve all timber lands, no distinction being made between Areas A and B; the lands so set aside were in fact in Area A.
 
 
 17
 Section 11 provided that the net proceeds derived from the sale of the lands "shall be paid into the Treasury of the United States to the credit of the Indians belonging to and having tribal rights on said reservation * * *."
 
 
 18
 Section 12 made necessary appropriations.
 
 
 19
 Section 13 provided that all the lands affected by the statute should be subject to federal laws prohibiting the introduction of intoxicants into "Indian country."
 
 
 20
 Section 14 provided that the United States was not bound to find purchasers for the opened land and further provided:
 
 
 21
 "That nothing in this Act shall be construed to deprive said Indians of Fort Berthold Indian Reservation of any benefits to which they are entitled under existing treaties or agreement not inconsistent with the provisions of this Act."
 
 
 22
 In determining whether this 1910 Act modified the Act of March 3, 1891, so as to diminish the Fort Berthold Reservation, we must apply the following three principles: (1) When Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress. United States v. Celestine, 215 U.S. 278, 285, 30 S.Ct. 93, 54 L.Ed. 195 (1909). Thus, there is no authority for an administrative alteration of boundaries as the Crow letter implies. (2) The purpose to abrogate treaty rights of Indians is not to be lightly imputed to Congress. Menominee Tribe of Indians v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). (3) The opening of an Indian reservation for settlement by homesteading is not inconsistent with its continued existence as a reservation. Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). Indeed, the statute in Seymour was similar in many significant respects to the statute in the instant case.
 
 
 23
 Here the 1891 boundaries of the Fort Berthold Reservation were established as a result of Congressional ratification of an 1886 Agreement with the Indians. The right to have the reservation boundaries remain undiminished carries with it many important subsidiary rights, among them the right for unemancipated Indians to be subject only to federal and tribal jurisdiction. The 1910 Act specifically recognized that the opening of the reservation for homesteading was not intended to deprive the Indians of any rights not inconsistent with the Act, and as Seymour establishes, homesteading is not inconsistent with the maintenance of the original reservation boundaries. The 1910 Act clearly by its own terms does not purport to alter the reservation boundaries.
 
 
 24
 New Town argues, however, that such an intention must be imputed to Congress because of later Congressional and administrative acts. We do not deem it necessary to examine these later acts in detail, for they are admittedly inconsistent and confusing. During the period of time immediately following the passage of the 1910 Act, the relevant legislative and administrative history apparently consistently treated the reservation as remaining intact.[8] By 1916, however, inconsistencies began to creep into the legislation and the reservation was sometimes referred to as the "former" Fort Berthold Reservation. However, these later statutes were not always consistent, even within themselves.[9] Thus we can find no clear intent by Congress to diminish the Fort Berthold Reservation from these later statutes.
 
 
 25
 A more serious deficiency in New Town's argument is its failure to marshal any congressional support whatsoever for its distinction between Areas A and B. As noted above, the 1910 Act itself, while it limited additional Indian allotments to Area B, in general made no distinction between Areas A and B. Homesteading was allowed throughout Areas A and B, occurred throughout both areas, and substantial lands and other benefits were reserved to the Indians in Area A. Furthermore, Indian allotments had previously been granted to Area A and were not affected by the 1910 Act. Moreover, the later congressional acts which New Town says support an inference of congressional intent to diminish the reservation because of their reference to the "former" Fort Berthold Reservation make no distinction between Areas A and B.[10]
 
 
 26
 The somewhat strained character of New Town's argument is demonstrated by the conclusion of its brief in which it gives three different descriptions of what it conceives to be the existing reservation.
 
 
 27
 First, it states that "the Act of June 1, 1910 and acts subsequent diminished the Fort Berthold Reservation by the quantum of land it opened for homestead settlement." Obviously, this cannot be the case, for as demonstrated above, the 1910 Act opened all lands north and east of the Missouri River for homestead settlement after reserving certain portions exclusively to the Indians, and settlement occurred in both Areas A and B. Yet New Town concedes that Area B remains part of the reservation.
 
 
 28
 Next New Town states that "The Fort Berthold Reservation north and east of the Missouri River is that area * * * which has been described by metes and bounds in the Act of October 29, 1949," 63 Stat. 1026. This particular area does not even encompass all of Area B, and furthermore is presumably now under water as it was taken for the Garrison Dam Reservoir.[11] Obviously that is not an accurate description of the reservation.
 
 
 29
 Finally, New Town describes the limits of the reservation as being "that area specified in the Complaint of the Appellant in its action for declaratory relief-this area would exclude the timber reserves on the east bank of the Missouri River." The grammar of this particular description is not entirely clear, and we are not sure whether New Town now concedes that the timber reserves are in fact on the reservation, or whether as the sentence implies they are excluded from the reservation. However, inasmuch as the timber reserves are in Area A, there seems to be no question that they should be included as part of the reservation, and there is further no reason to distinguish them from the rest of Area A.
 
 
 30
 We conclude that the boundaries of the Fort Berthold Reservation are those specified in the Act of March 3, 1891, 26 Stat. 1032, and that the Act of June 1, 1910, 36 Stat. 455 and subsequent Acts did not alter those boundaries.
 
 
 31
 The judgment of the District Court is affirmed.
 
 APPENDIX
 
 32
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 Entered pursuant to an unrepored opinion by Honorable George S. Register, Chief Judge of the United States District Court for the District of North Dakota
 
 
 [2]
 The Three Affiliated Tribes of the Fort Berthold Reservation is a corporate entity, organized under the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U.S.C. Secs. 461 et seq., which has succeeded to the interests of the Arikara, Gros Ventre and Mandan Tribes of Indians
 
 
 [3]
 Roughly, a rectangular area located in the northwest quarter of North Dakota, bisected from the northwest to the southeast by the Missouri River
 
 
 [4]
 Initially the city of Parshall, North Dakota, intervened as a party plaintiff, but it did not appeal from the District Court judgment
 
 
 [5]
 See generally 18 U.S.C. Secs. 1151 et seq
 
 
 [6]
 By the Act of August 3, 1914, 38 Stat. 681, these coal lands (in both Areas A and B) were open to settlement pursuant to the provisions of the 1910 Act; but only the surface rights were to be sold. The coal rights were reserved to the Indians and remain reserved to this day. The 1914 Act referred to these lands as being "in the Fort Berthold Indian Reservation, North Dakota." (emphasis added.)
 
 
 [7]
 This section of the statute also provided for donation without compensation to the Indians of 10 acres of land in each townsite for park, school or other public purposes, with 20 per cent of the proceeds of sale of the lots to be expended for the construction of schoolhouses or other public buildings or improvements in the townsites in which such lots were located. The Solicitor in his opinion for the Department of the Interior argued that this requirement "can only be construed as providing for contribution to the improvement of an area which the Indians would continue to utilize along with others admitted under the act."
 
 
 [8]
 See, e. g., Presidential Proclamation of June 29, 1911, 37 Stat. 1693 (opening the reservation for homesteading); 1910 Report of the Commissioner of Indian Affairs, p. 31; 1912 Report of the Commissioner of Indian Affairs, p. 60; Act of August 3, 1914, 38 Stat. 681 (providing for the disposition of the surface of reserved coal lands to homesteaders); Presidential Proclamation of September 17, 1915, 39 Stat. 1748 (opening the coal lands for homesteading)
 
 
 [9]
 For example, the Act of May 10, 1920, 41 Stat. 595, was entitled "An Act for the sale of isolated tracts in the former Fort Berthold Indian Reservation, North Dakota" (emphasis added). However, the body of the statute referred to "lands within the portion of the Fort Berthold Indian Reservation, North Dakota, opened under the Act of June 1, 1910" (emphasis added). These lands were located throughout Areas A and B
 
 
 [10]
 For example, the Act of May 18, 1916, 39 Stat. 123, provided for the distribution to the Indians of the money derived from the sale of surplus lands within the "former Fort Berthold Reservation." As noted above, these sales occurred throughout Areas A and B
 The Act of March 3, 1917, 39 Stat. 1131, is internally inconsistent and refers both to "lands in the Fort Berthold Reservation" and to "lands within said former reservation." However, the lands so referred to were located throughout Areas A and B. And see note 9, supra.
 
 
 [11]
 The act referred to took lands of the tribes for the construction of the Garrison Dam Reservoir. The taking area was described in five parts-"Within Reservation Boundaries," "Rural Areas," "In Townsites of Van Hook and Sanish, North Dakota," "Public Reserves in Townsites of Sanish and Van Hook, North Dakota," and coal rights. The reason for this division is not apparent, but the lands so designated were located in Areas A, B, and C
 More significantly, a portion of the land described as being "Within Reservation Boundaries" was in fact in Area A. See 63 Stat. at p. 1044, lines 55-59, p. 1045, lines 1-4.