Sophie STANKEY, Plaintiff
and Respondent,

v.

Ronald WADDELL, Chairman, Dewey County Board of Commissioners and Paul Hinzman, Louis Merkel, Frank Maciejewski, Robert Farlee, Board of County Commissioners of Dewey County, a Political Subdivision of the State of South Dakota, Defendants and Appellants.

No. 11610.

Supreme Court of South Dakota.

Argued Oct. 13, 1976.

Decided June 22, 1977.

Terry L. Pechota, Arthur F. Bunce, Michael Carter, N. N. Singh and Anita Remerowski, South Dakota Legal Services, Mission, for plaintiff and respondent.

Tom D. Tobin, Winner, Andrew Aberle, Dewey County State's Atty., Timber Lake, William J. Janklow, Atty. Gen., Pierre, for defendants and appellants.

Marvin J. Sonosky, Standing Rock Sioux Tribe, Arthur Lazarus, Jr., Cheyenne River Sioux Tribe, Washington, D. C., for amicus curiae.

DUNN, Chief Justice.

■ In this action, the state appeals an Eighth Judicial Circuit Court ruling which granted plaintiff abatement of her 1971 personal property taxes. Plaintiff in December 1973, filed an application for abatement with defendant, the Dewey County Board of Commissioners. She claimed that the property was exempt from taxation because she was an enrolled member of the Cheyenne River Sioux Tribe[1] and because the property was within the boundaries of the Cheyenne River Indian Reservation. The application was denied. The board determined that the property was located in that portion of Dewey County lying within the original boundaries of the Cheyenne River Reservation which had been disestablished by the Act of May 29, 1908, 35 Stat. 460,[2] and was not exempt from taxation. Plaintiff appealed to the circuit court which granted judgment on the pleadings in favor of plaintiff, relying on the decision of the United States Circuit Court for the Eighth Circuit in *United States ex rel. Condon v.*

*Erickson,* 1973, 8 Cir., 478 F.2d 684. We reverse.

The facts were stipulated by the parties. The location of the personal property was patented by the United States to Edward Anderson on October 10, 1917, recorded January 21, 1918, and ever since has been and now is in nontrust status. Substantially the same personal property was taxed to Bernel Stankey, a non-Indian, and plaintiff, his wife, prior to his death in 1968. The 1971 personal property tax assessment form was made out to and assessed only in plaintiff's name.

■ The boundaries of the Cheyenne River Reservation were originally established by the Act of March 2, 1889, 25 Stat. 888.[3] The issue presented in this case is whether the 1908 Act, which authorized the sale and disposition of a portion of the reservation, disestablished part of the reservation or merely opened a part of it for homestead entry. If the Act disestablished part of the reservation and altered the original boundaries, South Dakota courts have jurisdiction over the disestablished portion where there is no Indian allotment (i. e. checkerboard jurisdiction). If the Act merely opened lands on the reservation for settlement and the original boundaries remain, all of the lands within the original boundaries are "Indian country" and are subject to the jurisdiction of the United States Government. 18 U.S.C. § 1151(a). Absent disestablishment, plaintiff would be exempt from personal property taxes for her property on the reservation. *Bryan v.*

1. It was later stipulated that plaintiff is an enrolled member of the Standing Rock Sioux Tribe.

2. See Appendix.

3. "SEC. 4. That the following tract of land, being a part of the said Great Reservation of the Sioux Nation, in the Territory of Dakota, is hereby set apart for a permanent reservation for the Indians receiving rations and annuities at the Cheyenne River Agency, in the said Territory of Dakota, namely: Beginning at a point in the center of the main channel of the Missouri River, ten miles north of the mouth of the Moreau River, said point being the southeastern corner of the Standing Rock Reservation; thence down said center of the main channel of the Missouri River, including also entirely within said reservation all islands, if any, in said river, to a point opposite the mouth of the Cheyenne River; thence west to said Cheyenne River, and up the same to its intersection with the one hundred and second meridian of longitude; thence north along said meridian to its intersection with a line due west from a point in the Missouri River ten miles north of the mouth of the Moreau River; thence due east to the place of beginning." This area is what constitutes Ziebach and Dewey Counties in South Dakota.

*Itasca County, Minnesota,* 1976, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710; *Mescalero Apache Tribe v. Jones,* 1973, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114.

In *United States v. La Plant,* 1911, D.C. S.D., 200 F. 92, the court held that the use of the term "diminished" reservations in the 1908 Act necessarily indicated a congressional intent to extinguish the Indians' title to the lands at the time of the Act's passage. The *La Plant* decision was followed by this court in *State v. Sauter,* 1925, 48 S.D. 409, 205 N.W. 25. See also: *Lafferty v. State for Jameson,* 1963, 80 S.D. 411, 125 N.W.2d 171; *State v. Barnes,* 1965, 81 S.D. 511, 137 N.W.2d 683. However, in *United States ex rel. Condon v. Erickson,* 1972, D.C.S.D., 344 F.Supp. 777, the federal court abandoned its earlier decision and ruled that absent an express provision in the Act which restored the lands to the public domain, it could not impute that purpose.[4] The court relied on *Seymour v. Superintendent,* 1962, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346, and *City of New Town, North Dakota v. United States,* 1972, 8 Cir., 454 F.2d 121, which held that opening a reservation to settlement is not inconsistent with continued reservation existence. See also: *Mattz v. Arnett,* 1973, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92; *Russ v. Wilkins,* 1976, D.C.N.D.Cal., 410 F.Supp. 579. This decision was affirmed in *United States ex rel. Condon v. Erickson,* 1973, 8 Cir., 478 F.2d 684. That court acknowledged that it was a close case, but concluded that a holding favoring federal jurisdiction was required "unless Congress has 'expressly or by clear implication' diminished the boundaries." 478 F.2d at 689.

In the case at bar, plaintiff maintains that we are bound to follow the *Condon* decision because it has not been expressly overruled by the Eighth Circuit. The state contends that *Condon* is no longer a correct interpretation because the court in that case did not look at the legislative history behind the Act. It maintains that the United States Supreme Court in *DeCoteau v. District County Court for Tenth Judicial Circuit,* 1975, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300, removed the barrier to such inquiry, and that since *DeCoteau* the Eighth Circuit has expressed some doubts about the continued validity of *Condon.*

While the court in *Condon* did state it considered the legislative history of the 1908 Act, but rejected it after finding it inconsistent,[5] the court further stated it could not determine the intent "by application of the traditional methods of statutory construction." *United States ex rel. Condon v. Erickson,* supra, at 688. Rather than speculate as to whether the Eighth Circuit now may favor use of a different method of inquiry into the legislative history, we will attempt to determine the congressional intent within the guidelines of several recent United States Supreme Court decisions.

At the time of the 1908 Act, Congress had plenary power to abrogate the provisions of the earlier Act setting the boundaries of the Cheyenne River Reservation, *Lone Wolf v. Hitchock,* 1903, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299; *Choate v. Trapp,* 1912, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941; however, "when Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress." *United States v. Celestine,* 1909, 215 U.S. 278, 285, 30 S.Ct. 93, 95, 54 L.Ed.

---

4. In *Putnam v. United States,* 1957, 8 Cir., 248 F.2d 292, and in *United States ex rel. Miner v. Erickson,* 1970, 8 Cir., 428 F.2d 623, 638 (dissenting opinion), it was stated that *La Plant's* holding may have been overruled in light of *United States v. Pelican,* 1914, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676. *Putnam* was distinguished by this court in *State ex rel. Hollow Horn Bear v. Jameson,* 1959, 77 S.D. 527, 95 N.W.2d 181, and *State ex rel. Swift v. Erickson,* 1966, 82 S.D. 60, 141 N.W.2d 1. See also: *Beardslee v. United States,* 1967, 8 Cir., 387

F.2d 280; *State v. Moss,* 1970, Wyo., 471 P.2d 333.

5. "Resort to the applicable contemporaneous and subsequent legislative history is not helpful. Both the House and Senate Committee reports are silent as to the 1908 Act's effect upon the boundaries of the Cheyenne River Reservation." *United States ex rel. Condon v. Erickson,* supra, 478 F.2d at 688. (footnote omitted)

195; *City of New Town, North Dakota v. United States,* supra. We must not "lightly conclude than an Indian reservation has been terminated." *DeCoteau v. District County Court for Tenth Judicial Circuit,* supra, 420 U.S. at 444, 95 S.Ct. at 1092, 43 L.Ed.2d at 314; *Menominee Tribe of Indians v. United States,* 1968, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697. In interpreting the 1908 Act, we cannot conclude termination was intended without looking at the Act's terms, *Ash Sheep Co. v. United States,* 1920, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507; the congressional intent "must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." *Mattz v. Arnett,* supra, 412 U.S. at 505, 93 S.Ct. at 2258, 37 L.Ed.2d at 106; *United States v. Southern Pacific Transp. Co.,* 1976, 9 Cir., 543 F.2d 676; *United States v. Long Elk,* 1976, D.C. S.D., 410 F.Supp. 1174. Legislative ambiguities are to be resolved in favor of the Indians. Cohen, *Handbook of Federal Indian Law,* 1942, 37; *Bryan v. Itasca County, Minnesota,* supra; *DeCoteau v. District County Court for Tenth Judicial Circuit,* supra; *Antonine v. Washington,* 1975, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129; *Carpenter v. Shaw,* 1930, 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478; *Choate v. Trapp,* supra; *United States v. Celestine,* supra; *Worcester v. Georgia,* 1832, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483.

## THE ACT

■ Looking at the terms of the Act, we find that the Secretary of the Interior was authorized to sell and dispose of the portion of the Cheyenne River Reservation in question. A method of appraising the lands to be sold was outlined in the Act, and the proceeds from the sales were to be held by the United States Treasury in trust for the credit of the Indians of the reservations. This is unlike the provision of the Act in *DeCoteau* wherein the Sisseton and Wahpeton Bands sold their unallotted lands directly to the United States Government for a sum certain. However, "the changed method of payment is not conclusive with respect to congressional intent." *Rosebud*

*Sioux Tribe v. Kneip,* 1977, —— U.S. ——, 97 S.Ct. 1361, 1363, 51 L.Ed.2d 660.

■ Opening a reservation to settlement is not inconsistent with continued reservation existence, as the United States District Court noted in *Condon.* The state in this case argues that references to a "diminished" reservation and to timber rights upon land "as long as the lands remain part of the public domain," Act of May 29, 1908, 35 Stat. 460, Secs. 2, 9, signify an intent to terminate reservation status. The United States Court of Appeals for the Eighth Circuit rejected this argument in *Condon.* The court held that the reference to the "public domain" may have indicated restoration to the public domain for a limited period until lands were sold for homesteading, with the remaining lands unaffected (as presumably would be the reservation boundaries). Because it found these alternative interpretations feasible, the court would not find a clear intent to disestablish.

Since *Condon,* the Eighth Circuit has interpreted the phrase "diminished reservation" in several Acts to mean that the reservations were "diminished" in a geographical sense. *Rosebud Sioux Tribe v. Kneip,* 1975, 8 Cir., 521 F.2d 87; *United States ex rel. Cook v. Parkinson,* 1975, 8 Cir., 525 F.2d 120. The court in those cases was not faced with the "public domain" language present in the 1908 Act.

The 1908 Act contains the following school lands provisions:

"SEC. 7. That sections sixteen and thirty-six of the land in each township within the tract described in section one of this Act shall not be subject to entry, but shall be reserved for the use of the common schools and paid for by the United States at one dollar and twenty-five cents per acre, and the same are hereby granted to the States of South Dakota and North Dakota for such purpose as the same are located in the said States respectively; and in case any of said sections, or parts thereof, are lost to said States by reason of allotments thereof to any Indian or Indians, or otherwise, the

governors of said States, respectively, with the approval of the Secretary of the Interior, are hereby authorized, within the area in the respective States described in section one of this Act, to locate other lands not occupied not exceeding two sections in any one township, which shall be paid for by the United States as herein provided, in quantity equal to the loss, and such selections shall be made prior to the opening of such lands to settlement.

"SEC. 8. That there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of not more than two hundred and twenty-five thousand dollars, or so much thereof as may be necessary, to pay for the lands granted to the States of South Dakota and North Dakota, as provided in section seven of this Act. And there is hereby appropriated the further sum of seventy-five thousand dollars, or so much thereof as may be necessary, for the purpose of making the appraisement and classification and allotments provided for herein: *Provided,* That the latter appropriation, or any further appropriation hereafter

made for the purpose of carrying out the provisions of this Act, shall be reimbursed to the United States from the proceeds received from the sale of the lands described herein or from any money in the Treasury belonging to said Indian tribes respectively."

The United States Supreme Court in *Rosebud Sioux Tribe v. Kneip,* supra, held that based on the legislative history behind the 1904 Act in that case, a school lands provision nearly identical to that in the 1908 Act was included to " 'implement the grant in the enabling act and for no other reason.' " *Rosebud Sioux Tribe v. Kneip,* supra, 97 S.Ct. at 1370; quoting *Rosebud Sioux Tribe v. Kneip,* supra, 521 F.2d at 101. "Congress, therefore, clearly thought that it was acting pursuant to § 10 of the Act of February 22, 1889, and not *sub silentio* adding an additional grant for school lands located within a continuing reservation." *Rosebud Sioux Tribe v. Kneip,* supra, 97 S.Ct. at 1370.[6] Like the 1904 Act, the 1908 Act not only provided for grant of those sections, it also provided for a method and amount of payment for the lands.[7]

6. The Act of February 22, 1889, 25 Stat. 676, Sec. 10 provided:

"That upon the admission of each of said States into the Union sections numbered sixteen and thirty-six in every township of said proposed States, and where such sections, or any parts thereof, have been sold or otherwise disposed of by or under the authority of any act of Congress, other lands equivalent thereto, in legal subdivisions of not less than one-quarter section, and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said States for the support of common schools, such indemnity lands to be selected within said States in such manner as the legislature may provide, with the approval of the Secretary of the Interior: *Provided,* That the sixteenth and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grants nor to the indemnity provisions of this act, nor shall any lands embraced in Indian, military, or other reservations of any character be subject to the grants or to the indemnity provisions of this act until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain." (See discussion infra at 126)

7. The school lands provisions were later amended by the Act of February 17, 1910, 36 Stat. 196, to read as follows:

"SEC. 7. That sections sixteen and thirty-six of the land in each township within the tract described in section one of this Act shall not be subject to entry, but shall be reserved for the use of the common schools and paid for by the United States at two dollars and fifty cents per acre, and the same are hereby granted to the States of South Dakota and North Dakota for such purpose as the same are located in the said States, respectively; and in case any of said sections, or parts thereof, are lost to said States by reason of allotments thereof to any Indian or Indians, or otherwise, the governors of said States, respectively, with the approval of the Secretary of the Interior, are hereby authorized, within the area in the respective States described in section one of this Act, to locate other lands not occupied not exceeding two sections in any one township, which shall be paid for by the United States as herein provided, in quantity equal to the loss, and such selections shall be made prior to the opening of such lands to settlement.

"SEC. 8. That there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of not more than four hundred and fifteen thousand dollars, or so much thereof as may be necessary to pay for the lands granted to the States of South Dakota

While the 1908 Act does not contain the words "cede," "surrender," "grant," "convey," "sell," or "relinquish" as did some of the Acts in the cases discussed above wherein courts have found disestablishment, the Eighth Circuit in Rosebud held that extinguishment of a reservation may be "variously expressed." 521 F.2d at 90. Because of that court's holdings in the two cases since Condon, it would appear that each Act must be read in conjunction with its legislative history to determine the significance of the terms used in the Act.

## LEGISLATIVE HISTORY

The Act of March 2, 1889, 25 Stat. 888, Sec. 12, provided that the Secretary of the Interior could, after all allotments had been made, negotiate with the Indian tribes for "purchase and release" of unallotted portions of the reservations for sale to homesteaders. December 9, 1907, Senator Gamble of South Dakota, pursuant to the 1889 Act's provision, introduced S. 1385 which was entitled:

"[A] bill to authorize the sale and disposition of a portion of the surplus and unallotted lands in the Cheyenne River and Standing Rock Indian reservations in the State of South Dakota, and making appropriation and provision to carry the same into effect." 42 Cong.Rec. 207 (1907).

The bill was drawn to affect only a small portion of the reservations.

In a letter dated December 26, 1907, from Acting Secretary of the Interior Frank Pierce to the Chairman of the Senate Committee on Indian Affairs it was urged that action on S. 1385 await a conference between "an experienced Indian inspector" and the Indians, because

"these Indians may desire to cede a greater area than the bill covers, and I am anxious to comply with their wishes in this regard if it is practicable." S.Rep. No. 439, 60th Cong., 1st Sess. (1908) at 5; H.R.Rep. No. 1539, 60th Cong., 1st Sess. (1908) at 4.

The "experienced Indian inspector," Inspector James McLaughlin who had conducted negotiations at the Rosebud and Pine Ridge Reservations,[8] was advised to discuss with the Indians the possibility of opening a greater area.

"* * * you will proceed to the Cheyenne River and Standing Rock reservations and there lay the terms of the enclosed bill before the Indians of the two reservations and obtain an expression of their views thereon.

"You are very familiar with the conditions prevailing on these two reservations, and it seems unnecessary to attempt to give you any information from here. The bill, as you will note, was introduced in the Senate by Senator Gamble, who has referred it to me. For your information his letter is enclosed, and special attention invited to his opinion that a much larger body of land could be included in the negotiations and cover-

---

and North Dakota, as provided in section seven of this Act. And there is hereby appropriated the further sum of seventy-five thousand dollars, or so much thereof as may be necessary, for the purpose of making the appraisement and classification and allotments provided for herein: *Provided,* That the latter appropriation, or any further appropriation hereafter made for the purpose of carrying out the provisions of this Act, shall be reimbursed to the United States from the proceeds received from the sale of the lands described herein or from any money in the Treasury belonging to said Indian tribes, respectively: *And provided further, That the lands allotted, those retained or reserved, and the surplus lands sold, set aside for townsite purposes, or granted to the said States, or otherwise disposed of under the provisions of this Act, shall be subject for a period of twenty-*

*five years to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country."* (emphasis supplied)

As was stated in *Rosebud,* "the most reasonable inference from the inclusion of this provision (concerning prohibition of intoxicants on surplus lands) is that Congress was aware that the opened, unallotted areas would henceforth not be 'Indian country,' because not in the reservation." *Rosebud Sioux Tribe v. Kneip,* supra, 97 S.Ct. at 1376. (See discussion infra at 126, 127.)

8. See: *Rosebud Sioux Tribe v. Kneip,* supra, 521 F.2d at 92; *United States ex rel. Cook v. Parkinson,* 1975, D.C.S.D., 396 F.Supp. 473, 480.

ed by the bill, and if you find that the Indians think well of it, the proposed measure may be modified so as to include the greater area.

    \*     \*     \*     \*     \*     \*

"The instructions given you before you conferred with the Rosebud Indians concerning the opening of Tripp County may be followed so far as applicable." Letter from Commissioner of Indian Affairs Leupp to James McLaughlin, December 26, 1907.

McLaughlin arrived first at Fort Yates, North Dakota, the Standing Rock Agency, and on March 9, 1908, convened with a council of the reservation. Council at the Cheyenne River Agency was convened March 16, 1908. He explained S. 1385 as well as one sponsored by Congressman Marshall of North Dakota and Congressman Hall of South Dakota which proposed to open all of the Cheyenne River and Standing Rock Reservations. In addition, McLaughlin proposed an alternative or compromise.

McLaughlin explained to the Indians his purpose in meeting with them. He made it clear that it was not necessary to obtain their consent; he was sent to obtain their views before the legislation was passed.

"In considering the question which I will submit you must bear in mind that the law vests in Congress the right to open Indian reservations to settlement without obtaining the consent of the occupants or without even consulting them regarding same. This was fully determined by a decision of the Supreme Court of the United States in what is known as the Lone Wolf case in a decision handed down by that court on January 5, 1903, five years ago last January.

" \* \* \* The case was ultimately carried to the Supreme Court, which is the court of last resort, there being no appeal from its decision, and the decision of that court was in substance that Indians are wards of the Government; that the Government is guardian of the Indians; that a guardian has the right to do that which he deems best for the ward,

therefore, that Congress has the right to open Indian reservations by legislation without obtaining consent of the Indians occupying it or without consulting them relative thereto.

"This is the situation, my friends, as to the power of Congress to open the surplus lands of Indian reservations, but it is the desire of the Secretary of the Interior and Commissioner of Indian Affairs that Indians be consulted and their views ascertained before legislation for the opening of any of their surplus lands is enacted, and that is why I am now here to confer with you relative to this proposed legislation." S.Rep. No. 439, Part 2, Ex. 1, 60th Cong., 1st Sess. (1908) at 5; H.R. Rep. No. 1539, 60th Cong., 1st Sess. (1908) at 9.

In urging his proposed compromise, McLaughlin stated:

" \* \* \* You should consider the several provisions of these two bills, in a business-like manner, and meet the wishes of Congress commendably by determining upon how much of your reservation you are willing to relinquish, also as to the method of its disposal and manner of payment, but the conditions of its sale and manner of payment must be in accordance with the general provisions of the said bills.

"While Congress has the power under the law to open all of your surplus lands, should you meet the situation reasonably with some proposition that would be favored by the Secretary of the Interior and Commissioner of Indian Affairs, something that would justify their submitting it to Congress with their recommendation that it be adopted as a modification of these two bills incorporated in one bill, I am reasonably certain that it would be acceptable to Congress, and a diminished reservation might thus be secured to you." S.Rep. No. 439, Part 2, Ex. 1, 60th Cong., 1st Sess. (1908) at 5; H.R.Rep. No. 1539, 60th Cong., 1st Sess. (1908) at 9.

McLaughlin's proposed compromise was presented to the Indians by reference to a map.

"After a careful study of the proposed legislation, and being quite familiar with the conditions prevailing in the Standing Rock and Cheyenne River reservations, and also knowing that the area of these two reservations was much greater than the Indians can make proper use of, and that the opening of some of the surplus lands is demanded in the development of that section of the country, I deemed it best to submit a definite proposition as to the tract I thought the Indians should relinquish, and therefore suggested that they relinquish all the surplus lands of their reservation lying west of the line dividing ranges 23 and 24 in South Dakota and ranges 84 and 85 in North Dakota, together with one tier of townships lying along the southern boundary of their reservation, after allotments to those entitled thereto have been completed.

"In order that the Indians might fully understand the *boundaries of the proposed diminished reservation* I indicated with a blue pencil on a map of South Dakota the area which I believed would be to the best interests of the Indians to relinquish * * *.

* * * * * *

"After the four speakers (at the Standing Rock Agency) had expressed themselves in favor of relinquishing but twenty-nine townships of land, I stated my views very clearly as to the various phases of the question under consideration, whereupon Thomas Frosted, one of the four said spokesmen for the council, expressed his individual views, favoring the opening of the tract indicated in blue pencil on the inclosed map, and he was followed by Siaka, one of the leading Indians of the reservation, who also strongly spoke in favor of the cession thus indicated.

" * * * Early in the morning of the 11th, One Bull, a nephew of Sitting Bull and who succeeded that noted Indian as chief of the Sitting Bull band, called upon me and stated that he favored the lines suggested by me from the beginning and advocated it in the tribal council, but did not have sufficient support to carry his motion by a majority vote of the Indians present. * * *

* * * * * *

"The opening of the tracts as outlined in blue pencil on the inclosed map would *segregate the Standing Rock and Cheyenne River reservations* by opening a strip 18 miles in width between them, and give to each of said agencies legal subdivision *outboundaries* and compact diminished reservations, ample for the needs of the Indians of the respective reservations, and I am strongly of the opinion that the lines thus suggested would be for the ultimate best interests of the Indians." S.Rep. No. 439, Part 2, 60th Cong., 1st Sess. (1908) at 1–3; H.R.Rep. No. 1539, 60th Cong., 1st Sess. (1908) at 5–7. (emphasis supplied)

The Eighth Circuit in *Condon* stated that "[b]oth the House and Senate Committee reports are silent as to the 1908 Act's effect upon the boundaries of the Cheyenne River Reservation." *United States ex rel. Condon v. Erickson,* supra, at 688. However, the repeated references to the map and to the lines drawn on it as proposed boundaries for the reservations certainly raise the issue of disestablishment of original reservation boundaries. The proceedings of the councils at the two agencies, which were attached to the reports as exhibits, indicate that a change in boundaries was contemplated. These materials too speak of boundary lines.[9]

"ARTHUR TIBBETS. * * * We have decided here in council to draw a line showing the land we are willing to *cede.* We have decided to give up 29 townships." S.Rep. No. 439, Part 2, Ex. 1, 60th Cong., 1st Sess. (1908) at 7; H.R.

---

**9.** After McLaughlin's negotiations were reported to the Senate Committee on Indian Affairs, that committee reported S. 1385 with amendments. One of these amendments concerned the boundaries of the area to be opened. Senator Gamble at that time submitted a substitute amendment which was agreed to, and this became the boundary provision in the Act. 42 Cong.Rec. 4753 (1908).

Rep. No. 1539, 60th Cong., 1st Sess. (1908) at 11. (emphasis supplied)

"ANTOINE DEROCKBRAIN. * * We have decided that we would *relinquish* 29 townships. There are about five townships in North Dakota and the balance in South Dakota. *We have drawn a red line on the map,* the land within which we propose to *relinquish.* It is between ranges 21 and 22 in South Dakota and between ranges 86 and 87 in North Dakota." Id. at 8, 12. (emphasis supplied)

"(Inspector McLaughlin.) I want you to come up here to look at the map, so that you may consider the question further and give me your answer after supper. What you have said, my friends, appears in the minutes of the council and will go forward with my report. I feel very confident that Congress will not accept the 29 townships. The *tract of your reservation desired* would run along the line dividing ranges 23 and 24 from the southern boundary of your reservation through to the line dividing the States of North and South Dakota, thence west along the boundary line to a line dividing ranges 84 and 85, through to the Cannonball River, North Dakota, which is the northern boundary of your reservation, and also townships 18, in ranges 24, 25, 26, 27, 28, 29, and 30, this latter being conditioned upon taking two tiers of townships from the Cheyenne River Reservation.

" * * * I am not only here as a representative of the Government but also as your friend, and anything I can do to protect your interests I will gladly do, and I promise to do what I can to hold the southern *cession* to one township in width, and if they will accept one tier of townships on the south, and that lying west of the blue line between ranges 23 and 24, I will have accomplished a great deal more than I thought I could when I started out in this work * * *." Id. at 12, 16. (emphasis supplied)

"HIGH BEAR. * * * Of course, I do not wish the reservation to be thrown open against the will of the young people here, and therefore I will request, as my own personal opinion, that the *boundary line* mentioned by the inspector be adopted." Id. at 16, 20. (emphasis supplied)

The congressional reports also indicate that the reduced or diminished reservation referred to in the Act and the legislative materials was intended to be a tract apart from the opened area. The following excerpts from the reports clearly designate the two as distinct areas.

"Inspector McLAUGHLIN. * * * Knowing how dear your reservation lands are to you, and as I also said, if it were in my power to leave your reservation undisturbed I would gladly do so, provided I thought it for your best interests, but, as I explained in my talk yesterday, it is impossible for you to retain such a large tract of land, which is regarded as a barrier to the development of the country.

\* \* \* \* \* \*

"Now, my friends, as to the lines which I have marked on this map in blue pencil for you to relinquish, if every Indian on this reservation were to receive an allotment within the diminished reservation it would still leave you about 500,000 acres of surplus land, and *as there are a great many of your people allotted in the tract that will be ceded, you will therefore have a great many acres of surplus land within your diminished reservation.*

"The Marshall bill gives you permission to select any lands you may wish *in the portion to be ceded, or* those who are allotted there may relinquish if they so desire and come *within the diminished reservation.*" S.Rep. No. 439, Part 2, Ex. 1, 60th Cong., 1st Sess. (1908) at 10; H.R. Rep. No. 1539, 60th Cong., 1st Sess. (1908) at 14.

"A great railway system has recently been extended westward to the Pacific through the Standing Rock Indian Reservation and extends through the lands on that reservation proposed to be opened. It is hoped, should the bill become a law and the lands opened as is proposed, other

railways will be extended west of the Missouri River through the lands opened to settlement, which will lead to a rapid development of the northwestern section of the State of South Dakota and greatly benefit the *Indians not only upon the lands opened to settlement, but also the holdings of the Indians upon the reduced reservations.*" S.Rep. No. 439, 60th Cong., 1st Sess. (1908) at 4–5; H.R.Rep. No. 1539, 60th Cong., 1st Sess. (1908) at 3.

Further support of disestablishment is found in the references to the amount of acreage reserved to the Indians as part of the diminished reservations. Before the 1908 Act, the two reservations contained approximately five and one-fourth million acres.[10] The Act opened approximately 2,972,160 acres (1,728,000 acres in the Cheyenne River Reservation and 1,244,160 in the Standing Rock Reservation), or "about one-half of the two reservations,"[11] leaving

"to the Indians on the Standing Rock Reservation about 1,250,000 acres and to the Indians upon the Cheyenne River Reservation about 1,150,000, which is exclusive of any allotments now taken or which may hereafter be taken prior to the opening of the lands to settlement in the area to be opened. The lands reserved for the use of the Indians upon both *reservations as diminished*, in the opinion of your committee and of the Department, are ample and more than sufficient for the present and future needs of the Indians of the respective tribes." S.Rep. No. 439, 60th Cong., 1st Sess. (1908) at 4. (emphasis supplied)

For the diminished reservations to contain only the acreage figures in the report, any allotments in the opened area could not have been counted.

The legislative history with regard to the school lands provisions makes it clear that Congress was acting pursuant to the enabling act, rather than making an independent grant of the lands.

"Mr. SHERMAN. * * * Now the bill further provides for a transfer to the States of North and South Dakota of sections 16 and 36 in each township. The enabling act of those two States provided that the United States should eventually cede such sections to the States, respectively, for school purposes. We make appropriation herein for payment to the Indians for the land thus taken. That will amount to something like 160,000 acres." 42 Cong.Rec. 7005 (1908).

The primary concern at the time of enactment was not under what authority the grant of the school lands was made; it was the price per acre to be paid by the United States for the lands.

Similarly, the amendment of the school lands provisions in 1910 (see note 7, supra) added a prohibition against intoxicants to the opened area. If these areas were still a part of the reservation, no such provision would have been necessary. Because South Dakota did not have a constitutional prohibition against the sale of liquor, the intoxicants provision was urged. 45 Cong.Rec. 1769 (1910).

"The department has found that a provision prohibiting the introduction of liquor into the *territory ceded by the Indians* for a period of twenty-five years has greatly facilitated the work of suppressing the liquor traffic with the Indians, and as these Indians have especially requested that such provision be inserted in this bill, it is recommended that the following section be inserted * * *." S.Rep.No. 518, 61st Cong., 2nd Sess. (1910) at 5. (emphasis supplied)

Finally, the last section of the Act provides timber rights for domestic purposes to Indians with allotments on certain townships "as long as the lands remain part of the public domain." Excepted from these rights are lands in the school sections. This leads us to two conclusions. First, Congress treated both the school lands and other lands in the opened area as within the public domain. Second, the termination of public domain status would come, as the Eighth

---

**10.** 42 Cong.Rec. 7004 (1908) (remarks of Mr. Sherman).

**11.** Id.

Circuit decided in *Condon,* when the lands were sold to homesteaders. However, we interpret the unsold lands differently from the court in *Condon.* It felt these lands were unaffected. We hold that this could not have been Congress's intent because these "undisposed-of ceded lands" were later restored to tribal ownership and "made a part of the existing Reservation." Order of Restoration, June 12, 1941; Order of Restoration, January 21, 1952.

It has now been established that the Act of March 3, 1891, 26 Stat. 1035, terminated the Lake Traverse Indian Reservation and returned the lands to the public domain, *DeCoteau v. District County Court for Tenth Judicial District,* supra; that the Act of April 23, 1904, 33 Stat. 254, the Act of March 2, 1907, 34 Stat. 1230, and the Act of May 30, 1910, 36 Stat. 448, diminished the boundaries of the Rosebud Indian Reservation, *Rosebud Sioux Tribe v. Kneip,* supra; that the Act of May 27, 1910, 36 Stat. 440, diminished the boundaries of the Pine Ridge Indian Reservation, *United States ex rel. Cook v. Parkinson,* supra; and that the Act of February 14, 1913, 37 Stat. 675, returned certain unallotted lands of the Standing Rock Indian Reservation to the public domain, *United States v. Long Elk,* supra. We are convinced that the same congressional intent was present in enacting the 1908 Act. While some of the language used was different in the various Acts, the legislative consideration of these matters was carried on at about the same time, by the same people, and to bring about the same result. It is also clear to us that the Indians recognized this intent.

## CONCLUSION

This court assumed jurisdiction over unallotted lands within the opened areas after *La Plant* in 1911 and consistently maintained such jurisdiction until *Condon* in 1972. Based upon this continuum of state jurisdiction, upon the *DeCoteau, Rosebud, Cook,* and *Long Elk* decisions since *Condon,* and upon our examination of the 1908 Act and its legislative history, we now hold that Congress in 1908 intended to disestablish a portion of the Cheyenne River Reservation.

We are not unmindful that this holding will result in checkerboard jurisdiction in the opened area. The United States Supreme Court has in the past expressed its displeasure with this type of jurisdiction because of the confusion it brings to determining criminal jurisdiction. *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation,* 1976, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96; *Seymour v. Superintent,* supra. However, it cannot compare with the confusion in determining criminal jurisdiction that has existed since *Seymour* with Indian defendants charged with a crime within the original boundaries of a reservation claiming federal jurisdiction if convicted in state courts and claiming state jurisdiction if convicted in federal courts. The finality of where jurisdiction belongs far outweighs any problems of determining whether a crime was committed on Indian allotments or on deeded land. The latter is simply a matter of proof. Further, the Supreme Court's recent ruling in *Rosebud,* which also results in such checkerboard jurisdiction, appears to us to mean that when there is unmistakable congressional intent to alter a reservation boundary and provide for Indian allotments in the opened area, checkerboard jurisdiction is a necessary product.

Reversed.

All the Justices concur.

## APPENDIX

Act of May 29, 1908, 35 Stat. 460.

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior be, and he is hereby, authorized and directed, as hereinafter provided, to sell and dispose of all that portion of the Cheyenne River and Standing Rock Indian reservations in the States of South Dakota and North Dakota lying and being within the following described boundaries, to-wit: Beginning at a point on the one hundred and second meridian of

longitude west, where the township line between townships nine and ten north intersects the same; thence east on said township line to a point where the same intersects the range line between ranges twenty-four and twenty-five east of the Black Hills meridian; thence north on said range line to a point where the same intersects the township line between townships fifteen and sixteen north; thence east along said township line to a point in the center of the main channel of the Missouri River; thence in a northerly direction along the center of the main channel of said Missouri River to a point where the township line between townships eighteen and nineteen north intersects the same, and including also entirely all islands, if any, in said river; thence west on said township line to a point where the range line between ranges twenty-two and twenty-three east intersects the same; thence north along said range line to the northwest corner of section nineteen in township twenty-one north of range twenty-three east; thence east on the section line north of sections nineteen, twenty, twenty-one, twenty-two, twenty-three and twenty-four to a point where the same intersects the range line between ranges twenty-three and twenty-four east; thence north along said range line to the State line between the States of South Dakota and North Dakota; thence west on said State line to a point where the range line between ranges eighty-four and eighty-five west in North Dakota intersects the same; thence north on said range line to a point where said range line intersects the center of the main channel of the South Fork of the Cannon Ball River; thence in a westerly direction up and along the center of the main channel of the said river to a point where the same intersects the one hundred and second meridian of longitude west; thence south along said one hundred and second meridian of longitude west; thence south along said one hundred and second meridian of longitude west to the place of beginning, except such portions thereof as have been allotted to Indians: *Provided*, That sections sixteen and thirty-six of the lands in each township therein shall not be disposed of, but shall be reserved for the use of the common schools of the States of South Dakota and North Dakota, as the same may be located in the said States, respectively: *Provided further*, That the Secretary of the Interior may reserve such lands as he may deem necessary for agency, school, and religious purposes, to remain reserved as long as needed, and as long as agency, school, or religious institutions are maintained thereon for the benefit of said Indians: *Provided, however,* That the Secretary of the Interior is hereby authorized and directed to issue a patent in fee simple to the duly authorized missionary board, or other proper authority of any religious organization heretofore engaged in mission or school work on said reservations, for such lands thereon (not included in any town site herein provided for) as have been heretofore set apart to such organization for mission or school purposes.

"SEC. 2. That the lands shall be disposed of by proclamation under the general provisions of the homestead and town-site laws of the United States, and shall be opened to settlement and entry by proclamation of the President, which proclamation shall prescribe the manner in which the lands may be settled upon, occupied, and entered by persons entitled to make entry thereof, and no person shall be permitted to settle upon, occupy, or enter any of said lands except as prescribed in such proclamation: *Provided,* That prior to the said proclamation the Secretary of the Interior, in his discretion, may permit Indians who have an allotment within the area described in section one of this Act to relinquish such allotment and to receive in lieu thereof an allotment anywhere within the respective reservations thus diminished to which reservation the said Indians may belong: *Provided further,* That prior to the said proclamation the Secretary of the Interior shall cause allotments to be made to every man, woman, and child belonging to or holding tribal relations in said Cheyenne River and Standing Rock reservations who have not heretofore received the allotments to which they are entitled under provisions of existing

laws: *Provided further,* That the Secretary of the Interior be, and he is hereby, authorized and directed to cause to be surveyed all the lands embraced within said reservations, and to cause an examination to be made of the lands by experts of the Geological Survey, and if there be found any lands bearing coal, the said Secretary is hereby authorized to reserve them from allotment or disposition until further action by Congress: *Provided further,* That the rights of honorably discharged Union soldiers and sailors of the late civil and Spanish wars or Philippine insurrection, as defined and described in sections twenty-three hundred and four and twenty-three hundred and five of the Revised Statutes, as amended by the Act of March first, nineteen hundred and one, shall not be abridged.

"SEC. 3. That the price of said lands entered as homesteads under the provisions of this Act shall be fixed by appraisement as herein provided. The President of the United States shall appoint two commissions, one for each reservation, each commission to consist of three persons to inspect, appraise, and value all of said lands that shall not have been allotted in severalty to said Indians, or reserved by the Secretary of the Interior or otherwise disposed of, and excepting sections sixteen and thirty-six in each of said townships, each commission to be constituted as follows: One resident citizen of the States of North or South Dakota, one representative of the Indian Bureau and one person holding tribal relations with one of said tribes of Indians. That within twenty days after their appointment the said commissioners so appointed for each of the said reservations, respectively, shall meet and organize by the election of one of their number as chairman. Each commission is hereby empowered to select such clerks and assistants at such compensation as the Secretary of the Interior may approve. That said commissioners shall then proceed to personally inspect, classify, and appraise, in one hundred and sixty acre tracts each, all of the remaining lands embraced within each reservation as described in section one of this Act. In making such classification and ap-

praisement said lands shall be divided into the following classes: First, agricultural land of the first class; second, agricultural land of the second class; third, grazing land; fourth, timber land; fifth, mineral land, if any, the mineral land not to be appraised. That said commissioners shall be paid a salary of not to exceed ten dollars per day each while actually employed in the inspection and classification of said lands and necessary expenses to be approved by the Secretary of the Interior; such inspection and classification to be completed within six months from the date of the organization of said commissions respectively, and no compensation shall be paid to either the commissioners or employees after the said six months. That when said commissions shall have completed the classification and appraisement of all of said lands the same shall be subject to the approval of the Secretary of the Interior.

"SEC. 4. That the price of said lands shall be paid in accordance with the rules and regulations to be prescribed by the Secretary of the Interior upon the following terms: One fifth of the purchase price to be paid in cash at the time of entry, and the balance in five equal annual installments, to be paid in one, two, three, four, and five years, respectively, from and after the date of entry. In case any entryman fails to make the annual payments, or any of them, when due, all rights in and to the land covered by his entry shall cease, and any payments theretofore made shall be forfeited and the entry canceled, and the lands shall be reoffered for sale and entry under the provisions of the homestead law at the appraised price thereof: *And provided,* That nothing in this Act shall prevent homestead settlers from commuting their entries under section twenty-three hundred and one, Revised Statutes, by paying for the land entered the price fixed herein, receiving credit for payments previously made. In addition to the price to be paid for the land, the entryman shall pay the same fees and commissions at the time of commutation or final entry as now provided by law, where the price of land is one dollar

and twenty-five cents per acre, and when the entryman shall have complied with all the requirements and terms of the homestead laws as to settlement and residence and shall have made all the required payments aforesaid he shall be entitled to a patent for the lands entered: *And provided further,* That all lands remaining undisposed of at the expiration of four years from the opening of said lands to entry may, in the discretion of the Secretary of the Interior, be reappraised in the manner provided for in this Act. And it is further provided that any lands remaining unsold after said lands have been open to entry for seven years may be sold to the highest bidder for cash without regard to the prescribed price thereof fixed under the provisions of this Act, under such rules and regulations as the Secretary of the Interior may prescribe.

"SEC. 5. That the Secretary of the Interior is authorized to reserve from said lands such tracts for townsite purposes as in his opinion may be required for the future public interests, and he may cause the same to be surveyed into blocks and lots and disposed of under such regulations as he may prescribe, in accordance with section twenty-three hundred and eighty-one of the United States Revised Statutes. The net proceeds derived from the sale of such lands shall be credited to the Indians as hereinafter provided.

"SEC. 6. That from the proceeds arising from the sale and disposition of the lands aforesaid, exclusive of the customary fees and commissions, there shall be deposited in the Treasury of the United States, to the credit of the Indians belonging and having tribal rights on the reservations aforesaid in the States of South Dakota and North Dakota the sums to which the respective tribes may be entitled, which shall draw interest at three per centum per annum; that the moneys derived from the sale of said lands and deposited in the Treasury of the United States to the credit of said Indians respectively shall be expended for their benefit under the direction of the Secretary of the Interior.

"SEC. 7. That sections sixteen and thirty-six of the land in each township within the tract described in section one of this Act shall not be subject to entry, but shall be reserved for the use of the common schools and paid for by the United States at one dollar and twenty-five cents per acre, and the same are hereby granted to the States of South Dakota and North Dakota for such purpose as the same are located in the said States respectively; and in case any of said sections, or parts thereof, are lost to said States by reason of allotments thereof to any Indian or Indians, or otherwise, the governors of said States, respectively, with the approval of the Secretary of the Interior, are hereby authorized, within the area in the respective States described in section one of this Act, to locate other lands not occupied not exceeding two sections in any one township, which shall be paid for by the United States as herein provided, in quantity equal to the loss, and such selections shall be made prior to the opening of such lands to settlement.

"SEC. 8. That there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of not more than two hundred and twenty-five thousand dollars, or so much thereof as may be necessary, to pay for the lands granted to the States of South Dakota and North Dakota, as provided in section seven of this Act. And there is hereby appropriated the further sum of seventy-five thousand dollars, or so much thereof as may be necessary, for the purpose of making the appraisement and classification and allotments provided for herein: *Provided,* That the latter appropriation, or any further appropriation hereafter made for the purpose of carrying out the provisions of this Act, shall be reimbursed to the United States from the proceeds received from the sale of the lands described herein or from any money in the Treasury belonging to said Indian tribes respectively.

"SEC. 9. That nothing in this Act contained shall in any manner bind the United States to purchase any portion of the land herein described, except sections sixteen

and thirty-six or the equivalent in each township, or to dispose of said land except as provided herein, or to guarantee to find purchasers for said lands or any portion thereof, it being the intention of this Act that the United States shall act as trustee' for said Indians to dispose of the said lands and to expend and pay over the proceeds received from the sale thereof only as received and as herein provided: *Provided,* That nothing in this Act shall be construed to deprive the said Indians of the Cheyenne River or Standing Rock Indian reservations, in South Dakota and North Dakota, of any benefits to which they are entitled under existing treaties or agreements not inconsistent with the provisions of this Act: *Provided,* That Indians residing upon their allotments in townships sixteen north of ranges twenty-five, twenty-six, twenty-seven, twenty-eight, twenty-nine, thirty, and thirty-one east shall have the right to use timber in said townships, except on sections sixteen and thirty-six for domestic purposes only as long as the lands remain part of the public domain."